**BENCHMARK MEDICAL HOLDINGS, INC., Benchmark Medical Management Company, and Benchmark Acquisition Corporation, Plaintiffs,**

v.

**Glen "Rocky" BARNES, Defendant.**

**No. CIV.A. 2:03CV993–A.**

United States District Court, M.D. Alabama, Northern Division.

July 27, 2004.

Albert Loring Vreeland, II, Lehr Middlebrooks Price & Vreeland, PC, David James Middlebrooks, Lehr Middlebrooks Price & Vreeland, PC, Robert Brett Adair, Lehr Middlebrooks Price & Vreeland, PC, Birmingham, Steven R. Wall, Morgan Lewis & Bockius LLP, Philadelphia, PA, for Benchmark Medical Holdings, Inc., Benchmark Medical Management Company, Benchmark Acquisition Corp., Plaintiffs.

Benjamin Saxon Main, Ball Ball Matthews & Novak PA, Richard A. Ball, Jr., Ball Ball Matthews & Novak PA, Robert A. Huffaker, Rushton Stakely Johnston & Garrett PC, Montgomery, AL, for Glen "Rocky" Barnes, Defendant.

### *FINDINGS OF FACT AND CONCLUSIONS OF LAW*

ALBRITTON, Senior District Judge.

## I. *INTRODUCTION*

Benchmark Medical Holdings, Inc., Benchmark Medical Management Company, and Benchmark Acquisition Corpora-

tion ("Plaintiff" [1] or "Benchmark") filed their Complaint against several Defendants on October 2, 2003, bringing claims for violation of the Lanham Act (Count I), violation of the Alabama Trade Secrets Act (Count II), breach of asset purchase agreement (Count III), breach of employment agreements (Count IV), breach of noncompetition agreements (Count V), breach of fiduciary duty (Count VI), and tortuous interference with contract (Count VII). Some of the claims were disposed of before trial, and only one defendant, Glen "Rocky" Barnes ("Defendant" or "Barnes") remained. The court has jurisdiction on the basis of diversity of citizenship.

Arbitration proceedings were also pursued against the Defendants. The Defendants moved the court for a Preliminary Injunction or Stay of the arbitration proceedings on December 17, 2003. At oral argument on December 22, 2003, the Plaintiffs consented to a two-week stay of the arbitration proceedings while Defendants' motions for a preliminary injunction or stay were pending. On December 29, 2003, the court ordered (Doc. # 61) "that the parties cease all arbitration proceedings and that such proceedings be stayed pending determination by the court of the Defendants' Motions for Preliminary Injunction or Stay."

On February 27, 2004, the court vacated this order and denied Barnes' motion [2] for a preliminary injunction or stay of the arbitration proceedings. In denying this motion, the court indicated that it would be receptive to considering means of achieving greater efficiency in these proceedings. The court stated that recognizing the problems of judicial economy and the dangers of inconsistent results, some other courts, finding themselves without discretion to enjoin the arbitration proceedings, have stayed their own proceedings. The court noted that the Defendant has not pursued such a motion, or a motion to compel the Plaintiffs to arbitrate claims included in the Complaint. The court indicated that it was disinclined to stay the proceedings before it without hearing from the parties on this issue. The court informed the Defendant that if he were interested in pursuing such a motion to compel arbitration and to stay the court proceedings, the court would be receptive to considering it. No such motion was made.

The Plaintiffs reached a settlement with three of the original Defendants, Quinn S. Millington, Dale M. Yake, and Rehab Solutions, LLC, which resulted in a joint stipulation of dismissal. Thus, the Court dismissed Counts I, II and V with prejudice. Barnes was the only remaining Defendant.

In the same order in which the court denied his request for stay of the arbitration proceedings, the court dismissed Barnes' counter-claims without prejudice. Thus, when the court considered Barnes' summary judgment motion, the only claims remaining before this court were Count III (breach of asset purchase agreement), Count IV (breach of employment agreement), Count VI (breach of fiduciary

---

1. For ease of discussion, the court will refer to the various corporate forms of Benchmark involved in this case as a singular Plaintiff, Benchmark.

2. Before the issuance of the court's memorandum opinion and order on the preliminary injunction and stay motions, Benchmark and all of the Defendants other than Barnes reached a settlement agreement and were dismissed. Thus, only Barnes' motion remained pending before the court.

duty), and Count VII (tortuous interference with contract). On March 5, 2004, the court denied Barnes' motion for summary judgment.

On March 24, 2004, Benchmark moved the court to dismiss Count VI (breach of fiduciary duty) and Count VII (tortuous interference with contract) in order to achieve greater efficiency by pursuing these damage-related claims, which were similar to the damages claims being pursued in the arbitration proceedings, through a single arbitral forum. On March 29, the court dismissed these claims with prejudice. Thus, the only remaining claims before this court are Count (III) for breach by Barnes of the purchase agreement and Count (IV) for breach of Barnes' employment agreement. The Plaintiff seeks a permanent injunction directing the Defendant to comply with the restrictive covenants contained respectively in his purchase and employment agreements.

With the damage claims proceeding in arbitration, and by request of the parties, the court makes no findings of fact as to whether Barnes has in the past breached the purchase agreement or the employment agreement. Instead, the parties have agreed that Barnes intends to act in contravention of the non-compete agreements in the future to the greatest extent legally permitted. Thus, as stated by the Defendant's counsel, "what we now have is tantamount to a declaratory judgment. We are saying we don't think these non-competes are valid for various reasons and that the noncompetes, to the extent there is validity, they are unreasonable as to length and geographic area and that you would try those issues—tell us are the noncompetes valid; if so, to what extent ...." Transcript at p. 34:8 to 34:14. As stated by the Plaintiff in its post-trial brief, "[a]t trial, the parties agreed that the only issues remaining for the court to decide involve the enforceability of the two non-competition agreements signed by the [D]efendant as part of the sale of his business." Plaintiff's Post Trial Brief at 1 (citing Transcript at p. 32–34). The parties agreed to proceed in this manner.

The court conducted a bench trial on May 26 and 27, 2004, after which the parties submitted briefs. The issues before this court are whether the non-compete agreements contained in the purchase agreement and the employment agreement are valid and, if so, to what extent they are enforceable. Consistent with the relief requested in its complaint, the Plaintiff seeks a permanent injunction directing the Defendant to comply with the terms of the restrictive covenants contained in these agreements. The Defendant asks the court to declare the restrictive covenants invalid.

## II. FINDINGS OF FACT AND CONCLUSIONS OF LAW[3]

Based on the testimony and evidence submitted at trial, together with briefs and argument of counsel, the court makes the following findings of fact and conclusions of law:

On September 28, 2001, Benchmark purchased Rehab Associates. Plaintiff's Exhibit 103, Purchase Agreement. The Purchase Agreement included a variety of provisions, ranging from paying Rehab Associates' debts to earn-out incentives,

---

**3.** The court in this opinion borrows liberally from its earlier summary judgment memorandum opinion and order in this case, *Bench-* *mark Medical Holdings, Inc. v. Rehab Solutions, LLC.,* 307 F.Supp.2d 1249 (M.D.Ala. 2004).

which in total created the possibility of the acquisition being a thirty million dollar purchase, and at the least required Benchmark to pay 25.5 million dollars.[4] Transcript at p. 125:11 to 125:22. Benchmark owns, through its subsidiaries, a network of physical and occupational rehabilitation facilities in various locations in the United States. *See id* at p. 121:23 to 122:9, 124:1 to 124:16, 124:23 to 125:10. Rehab Associates was an expanding physical therapy business, which when it was purchased was operating approximately thirty-four physical and occupational health facilities located in Alabama, Colorado, Georgia, Illinois, and Missouri. *Id.* at p. 37:23 to 38:3. For Benchmark, however, the acquisition of Rehab Associates went beyond the facilities. *Id.* at 127:4 to 127:19. The purchase of Rehab Associates was largely a purchase of Barnes, and the relationships that he had in the Southeast. *Id.* Benchmark believed that it was buying the goodwill of Rehab Associates and the continuing efforts of Barnes, who had grown the business into what it was on the day that it was sold. *Id.* For the Plaintiff, an important part of getting the benefit of its bargain and the deal working was Barnes cultivating and developing those opportunities and relationships in order to grow Benchmark's acquisition into something larger than it was when it was purchased. *Id.* To that end, at the time the purchase of Rehab Associates was closed Benchmark hired Barnes as Regional Vice President and an Employment Agreement was executed by the parties.

An essential condition of the purchase by Benchmark was an agreement by Barnes not to compete. The terms of such an agreement were negotiated between Benchmark and Barnes, both represented by counsel, and the final form was contained in two documents without which negotiations would have ended and Benchmark would not have purchased Rehab Associates. *Id.* at p. 39:13 to 39:24, 81:16 to 84:5, 122:10 to 123:25, 127:25 to 129:15. The documents were executed and the sale was closed.

As part of the Purchase Agreement, Barnes agreed to a non-compete provision that provides as follows:

> **Prohibited Activities.** Barnes agrees that for a period of five (5) years from the Closing Date, he will not, anywhere within seventy-five (75) miles of any of the facilities operated or managed by a Company as of the date hereof (the "Territory"):
>
> (a) (directly or indirectly) own, manage, operate, join, control, finance or participate in the ownership, management, operation, control or financing of, or be connected as an officer, director, employee, principal, agent, representative, consultant, investor, owner, partner, manager, joint venturer or otherwise with, or permit his or its name to be used by or in connection with, any business or enterprise engaged anywhere in the Territory in the businesses conducted by Buyers or a Company or

---

4. The parties disagree over whether the value of the purchase was thirty million dollars or approximately 6.6 million dollars. Transcript at p. 125:11 to 125:22, p. 133:19 to 139:12. Resolving this disagreement, which involves, for example, deciding whether the payment of Rehab Associates' debt of approximately seventeen million dollars should be considered part of the purchase price, is not of any

importance to the ultimate resolution of the case. *See id.* at 133–36. Accordingly, the court declines to answer this question. Without determining the actual value of the purchase, the court concludes that Benchmark paid at least 25.5 million dollars, and Barnes personally received approximately three million dollars. *Id.* at p. 36:20 to 36:21, 125:11 to 125:22, 133:19 to 133:22.

any businesses engaged in by Buyers or a Company or their affiliates on the Closing Date, during the two year period prior to the Closing Date, or at the time of their termination.

(b) call on or solicit any person who or which is, at that time, or has been within two years prior thereto, a customer of a Company or its affiliates with respect to any business of Buyers or a Company or its affiliates covered by clause (a) above;

(c) solicit the employment of or hire any person who at the time of such solicitation or hiring or who within one year prior thereto, is or was employed by a Company or its affiliates on a full or part-time basis; or

(d) call upon any person as a prospective acquisition candidate who was, either called upon by a Company as a prospective acquisition candidate or was the subject of an acquisition analysis by a Company.

Notwithstanding the above the foregoing covenant shall not be deemed to prohibit Barnes from acquiring as a passive investment not more than five (5) percent of the outstanding voting capital stock of a competing business, whose stock is traded on a national securities exchange or through the automated quotation system of a registered securities association. Plaintiffs' Exhibit 103, Purchase Agreement § 6.2.

Viewed as a particularly valuable asset, Barnes's employment with Benchmark as Regional Vice President was a condition of the purchase of Rehab Associates. Barnes agreed to devote his "full business time and attention to the performance of his duties and responsibilities ...." Plaintiff's Exhibit 104, Employment Contract § 2.

His Employment Agreement includes a non-compete agreement that provides as follows:

In consideration of his employment with the Company, the Employee agrees that, during his employment with the Company and for twenty-four (24) months following the date of the Employee's termination from the Company, he will not directly or indirectly: (a) engage, whether as a principle, agent, investor, representative, stockholder (other than as the holder of not more than five percent (5%) of the stock or equity of any corporation, the capital stock of which is publicly traded), employee, consultant, volunteer or otherwise, with or without pay, in any activity or business venture, anywhere within the continental United States, which is competitive with the business of the Company or any of its subsidiaries on the date of his termination; (b) solicit or entice or endeavor to solicit or entice away from the Company or any of its subsidiaries any director, officer, employee, agent or consultant of the Company or any of its subsidiaries, either on his own account or for any person, firm, corporation or other organization, whether or not the person solicited would commit any breach of such person's contract of employment by reason of leaving the Company's service; (c) solicit or entice or endeavor to solicit or entice away any of the clients or customers of the Company or any of its subsidiaries, either on his own account or for any other person, firm, corporation or organization; or (d) employ any person who was a director, officer or employee of the Company or any of its subsidiaries on the date of the Employee's termination, unless such person's employment was terminated by the Company or any

of its subsidiaries, or employ any person who is or may be likely to be in possession of any Confidential Information. *Id.* at § 8.1.

As part of the agreement, Barnes acknowledged that he gave "careful consideration to the restraints imposed upon him ... and is in full accord as to the necessity of such provisions as reasonable and proper protection of the Company's interests and [that] the restraints imposed upon him ... are reasonable with respect to subject matter, time period and geographical area." *Id.* at § 8.3. The parties agreed that if a court or other authority refused to enforce the covenants of their agreement, because they "cover too extensive a geographic area or too long a period of time, any such covenant shall be deemed appropriately amended and modified in keeping with the intention of the parties to the maximum extent permitted by law." *Id.* at § 8.2.

Barnes' employment was terminated by Benchmark on October 2, 2003, and the parties now dispute the enforceability of the non-compete agreements.

Barnes argues that he should not be bound by the covenants not to compete contained in the purchase agreement and his employment contract because (1) as a physical therapist he is a professional, thus under Alabama law he is not subject to non-compete agreements, (2) "Benchmark lacks a protectable interest sufficient to bar Barnes from calling upon or soliciting business, from doctors, hospitals or other medical providers who were not pre-existing clients of Benchmark or with whom Benchmark had no business relationship,"[5] (3) the geographic scope of the limitations are unreasonable, and (4) the

durations of the agreements are unreasonable.

## 1) The Applicability of Non–Compete Agreements to Physical Therapists

### A) Whether Alabama and/or Pennsylvania Law Applies to the Parties' Non–Competition Agreements

■ The Purchase Agreement provides that it is governed by Pennsylvania law, while the Employment Agreement provides that is governed by the law of Alabama. This court concluded in its summary judgment memorandum opinion and order, for reasons stated therein, that Alabama courts, due to the State of Alabama's fundamental public policy against non-competition agreements, will not apply another state's law if the covenant not to compete is void under Alabama law. *Benchmark Medical Holdings, Inc. v. Rehab Solutions, LLC,* 307 F.Supp.2d 1249, 1258–60 (M.D.Ala.2004). Accordingly, Alabama law is applicable to the non-compete provisions of both the Purchase and the Employment Agreements.

### B) Whether Under Alabama Law Non–Compete Agreements Apply to Professionals

■ Regarding non-competition agreements, Alabama law provides:

(a) Every contract by which anyone is restrained from exercising a lawful profession, trade, or business of any kind otherwise than is provided by this section is to that extent void.

(b) One who sells the good will of a business may agree with the buyer and one who is employed as an agent, servant or employee may agree with his

---

5. Post–Trial Brief of Defendant Barnes at 15.

employer to refrain from carrying on or engaging in a similar business and from soliciting old customers of such employer within a specified county, city, or part thereof so long as the buyer, or any person deriving title to the good will from him, or employer carries on a like business therein.

(c) Upon or in anticipation of a dissolution of the partnership, partners may agree that none of them will carry on a similar business within the same county, city or town, or within a specified part thereof, where the partnership business has been transacted.

ALA. CODE § 8–1–1 (1975).

Under Alabama law, an agreement not to compete that restrains the practice of a lawful business or trade can only be enforced if the party seeking to uphold the provision meets the burden of demonstrating that the non-competition agreement, pursuant to Section 8–1–1(a), is not void. *Constr. Materials, Ltd., Inc. v. Kirkpatrick Concrete, Inc.*, 631 So.2d 1006, 1009 (Ala.1994); *Orkin Exterminating Co. v. Etheridge*, 582 So.2d 1102, 1104 (Ala.1991). Section 8–1–1(a) provides for a general prohibition on covenants not to compete, subject only to the limited exceptions provided by sub-sections (b) and (c) of Section 8–1–1. *Cherry, Bekaert & Holland*, 582 So.2d at 505. "Although the remaining subsections of § 8–1–1 provide for exceptions to the general rule, including an exception for the sale of the good will of a business, this Court has stated on numerous occasions that a 'professional' cannot fall within these statutory exceptions." *Friddle v. Raymond*, 575 So.2d 1038, 1040 (Ala.1991) (citing *Wyatt Safety Supply, Inc. v. Indus. Safety Prods., Inc.*, 566 So.2d 728, 730 (Ala.1990); *Thompson v. Wiik, Reimer & Sweet*, 391 So.2d 1016,

1019–20 (Ala.1980); *Gant v. Warr*, 286 Ala. 387, 240 So.2d 353, 355–56 (1970); *Odess v. Taylor*, 282 Ala. 389, 211 So.2d 805, 811–12 (1968)). Therefore, the statutory exceptions allowing non-compete agreements in the sale of good will of a business and in employment contracts do not apply to professionals.

## C) What Constitutes a Profession under Alabama law for Purposes of Non–Compete Agreements?

The Alabama Supreme Court has stated that "[n]o better statement of the difference between engaging in a profession, as distinguished from a trade or business, can be found than the following observation made by the late Dean Roscoe Pound in his work *The Lawyer from Antiquity to Modern Times....* " *Odess*, 211 So.2d at 812. Pound explained:

"There is much more in a profession than a traditionally dignified calling. The term refers to a group of [people] pursuing a learned art as a common calling in the spirit of a public service— no less a public service because it may incidentally be a means of livelihood. Pursuit of the learned art is the purpose. Gaining a livelihood is incidental, whereas, in a business or trade it is the entire purpose." *Id.* (citing ROSCOE POUND, THE LAWYER FROM ANTIQUITY TO MODERN TIMES 5–6 (1953)).

The Alabama Supreme Court has "stated several relevant factors to be considered in resolving the issue as to what constitutes a profession: professional training, skill, and experience required to perform certain services; delicate nature of the services offered; and the ability and need to make instantaneous decisions." *Friddle*, 575 So.2d at 1039. For purposes of non-competition agreements, under Ala-

bama law, doctors, lawyers, accountants, and veterinarians have all been held to professionals. *Pitney Bowes, Inc. v. Berney Office Solutions*, 823 So.2d 659, 665 (Ala.2001); *Odess*, 211 So.2d at 811–12.[6]

In *Odess*, even though Dr. Taylor worked for Dr. Odess, the court deemed him to be a professional, who was not subject to a non-compete agreement. *Odess*, 211 So.2d at 811–12. Characteristics of the professional skill exercised by Taylor included making "delicate and instantaneous decisions." *Id.* at 811. The court also focused upon "[t]he relationship between doctor and patient, or lawyer and client[, which] is one of personal confidence. The patient or client is not a 'customer.' He has sought the services of his professional adviser because of reliance on the professional training, skill, experience, and integrity of his adviser. He does not contemplate his professional adviser will act only upon the directions of another." *Id.* at 811–12.

In analyzing whether veterinarians are professionals, the Alabama Supreme Court noted that "Ala.Code 1975, §§ 34–29–60 through –94, governs the practice of veterinary medicine and provides specific qualifications required of licensed veterinarians,

referred to as 'professional qualifications.'" *Friddle*, 575 So.2d at 1040. The Court "[c]onsidering the knowledge, skill, and education required of licensed veterinarians, as well as their duty to promote the public health, safety, and welfare of the State of Alabama, consider[s] it apparent that the legislature intended that persons licensed to participate in the practice of veterinary medicine be considered professionals." *Id.* (citing ALA. CODE § 34–29–62). The court noted that "it is likewise [the court's] view that persons who practice the science of veterinary medicine are members of a profession." *Id.*

In a specially concurring opinion in *Burkett v. Adams*, 361 So.2d 1 (Ala.1978) (wherein the Alabama Supreme Court found public accountants to be professionals for purposes of non-compete agreements), then Alabama Supreme Court Chief Justice Torbert wrote:

> Although the majority opinion makes reference to a statutory procedure of certification and licensing, I do not believe this court to be bound by this fact, nor by the mere fact that a particular occupation may be characterized as "professional" in a statute. All occupations seek to improve their standards

---

**6.** The Alabama Supreme Court has not offered a clear explanation of why accountants, both certified public accountants and uncertified public accountants, are considered professionals. In *Gant v. Warr*, the foundational case for accountants being considered professionals, the Alabama Supreme Court stated only "[t]here can be no question that the practice of accounting by certified public accountants, as here, is a profession." *Gant*, 240 So.2d at 355–56. In *Burkett v. Adams*, addressing whether a public accountant should also be deemed a professional, the Alabama Supreme Court noted "[c]ertainly, a C.P.A. may be entitled, because of such status, to perform services not properly performed by a public accountant. But the close association and similarity of services performed by

the two callings indicate that both could, and should, be considered together. Therefore, because we have previously held that the practice of accounting by a C.P.A. was a profession, we see no reason to prevent deeming public accounting likewise a profession." *Burkett v. Adams*, 361 So.2d 1, 3 (Ala.1978). In subsequent cases, the Alabama Supreme Court has cited to *Gant* and *Burkett* for the proposition that accountants, both certified and uncertified, are professionals. *See, e.g., Thompson v. Wiik, Reimer & Sweet*, 391 So.2d 1016, 1019 (Ala.1980); *Mann v. Cherry, Bekaert and Holland*, 414 So.2d 921, 924 (Ala. 1982); *Cherry, Bekaert & Holland v. Brown*, 582 So.2d at 505.

through licensing and certification procedures, but I do not believe that all would reach the "professional" status insofar as voiding a covenant by a seller of the good will of the business to refrain from competing with his purchaser. *Id.* at 3.

Drawing upon Chief Justice Torbert's concurrence, the Alabama Court of Civil Appeals noted that "[t]here are multitudes of businesses, but few professions." *Dobbins v. Getz Exterminators of Alabama, Inc.,* 382 So.2d 1135, 1137 (Ala.Civ.App. 1980). The court found that even though the former employees for an extermination service "may be professionals in their business in the sense that they may have worthily attained excellence as to knowledge, skill, training, expertise, proficiency and experience in the pest control field; ... this would not convert their pest control business into a profession." *Id.* Nor was the court persuaded by a statutory reference to such business enterprises as "professional services," for "the word 'profession' so used in said § 8–1–1 means much more than such terms utilized in said Title 2, Chapter 28." *Id.*

### D) Under Alabama Law, Are Physical Therapists Professionals?

■ The parties agree that the Alabama appellate courts have not addressed the specific issue of whether a physical therapist is a professional for purposes of noncompetition agreements. Neither party has sought to have the question certified to the Alabama Supreme Court. Despite reference by the court to considering this possibility, the parties have expressed a desire not to, but to have prompt resolution of their dispute by this court. Having considered all of the evidence presented and the legal arguments advanced, the court believes that the answer is sufficiently apparent to make it appropriate to reach a conclusion as to whether physical therapists are professionals.

For purposes of its licensing requirements provision, the Alabama legislature defines physical therapy as "treatment of a human being by the use of exercise, massage, heat, cold, water, radiant energy, electricity or sound for the purpose of correcting or alleviating any physical or mental condition or preventing the development of any physical or mental disability, or the performance of neuromuscular-skeletal tests and measurements to determine the existence and extent of body malfunction ...." ALA. CODE § 34–24–191 (1975).[7]

Physical therapists are not permitted to practice their skills in the State of Alabama unless they are registered and licensed. ALA. CODE § 34–24–210 (1975). The application for registering as a physical therapist requires that the applicant "present evidence satisfactory to the board[8] that he is of good moral character and that he has completed a program of physical therapy education appropriate for training a physical therapist ... approved by the board or a nationally recognized accrediting agency." ALA. CODE § 34–24–210 (1975). The Alabama law also requires that applicants seeking to practice

---

7. The court's discussion of the professional status of physical therapists is in reference to the practice of physical therapy by physical therapists ALA. CODE § 34–24–191(a)(2), not physical therapist assistants ALA. CODE § 34–24–191(a)(4).

8. The board refers to the Board of Physical Therapy, which was established pursuant to ALA. CODE § 34–24–192 (1975).

as a physical therapist complete an examination, which is administered by the board: "The examination given applicants for registration as a physical therapist shall be a written examination, approved by the board." ALA. CODE § 34–24–212 (1975). The law requires that "[s]uch examination shall test the applicant's knowledge of the basic and clinical sciences as they relate to physical therapy, physical therapy theory and procedures and such other subjects as the board may deem useful to test the applicant's fitness to practice physical therapy. A practical or demonstration examination may be required if so determined by the board." *Id.* The State of Alabama also requires that the board "adopt a program of continuing education for its licensees . . . ." ALA. CODE § 34–24–216 (1975). In order to renew one's license, the licensee must successfully complete this program of continuing education. *Id.*

The State of Alabama also requires that the board refuse to license, or suspend or revoke the license of, anyone who has: (1) Practiced physical therapy other than upon the referral of a physician licensed to practice medicine or surgery, and a dentist licensed to practice dentistry; or practiced as a physical therapist assistant other than under the direction of a registered physical therapist; (2) Used drugs or intoxicating liquors to an extent which affects his professional competency; (3) Been convicted of a felony or of a crime involving moral turpitude; (4) Obtained or attempted to obtain a license by fraud or deception; (5) Been grossly negligent in the practice of physical therapy or in acting as a physical therapist assistant; (6) Been adjudged mentally incompetent by a court of competent jurisdiction; (7) Been guilty of conduct unbecoming a person registered as a physical therapist or licensed as a physical therapist assistant or of conduct detrimental to the best interest of the public; (8) Been convicted of violating any state or federal narcotic law; (9) Treated or undertaken to treat human ailments otherwise than by physical therapy as defined in this article; (10) Advertised unethically according to standards as set by the board; or (11) Failed or refused to obey any lawful order or regulation of the board. ALA. CODE § 34–24–217 (1975).

Three universities in Alabama educate prospective physical therapists. Transcript at p. 223:22 to 223:24. The University of Alabama at Birmingham, the University of South Alabama in Mobile, and Alabama State University in Montgomery have doctoral programs in physical therapy. *Id.* at p. 223:22 to 224:4. These institutions are accredited by the Commission for Accreditation in Physical Therapy Education. *Id.* at 224:10 to 224:10. To gain entry to one of these programs an applicant generally needs to have a bachelor's degree; however, early entry, not unlike with medical school, is possible for students with a higher grade point average who have completed certain pre-requisites. *Id.* at p. 221:19 to 222:10. These early entry students "most definitely . . . have to have a year of college chemistry for science majors, a year of biology, a year of physics with labs, trigonometry, statistics, human physiology, and then the general core courses like English and some fine arts." *Id.* at p. 222:1 to 222:5. Graduate education in physical therapy is shifting from a two year master's degree program to three year doctoral requirement. *Id.* at p. 222:6 to 222:15. For example, the incoming class in the Fall of 2004 at the University of South Alabama will now be candidates for a Doctorate of Physical Therapy and will be required to complete three years of study. *Id.* at p. 222:16 to

223:1. After completing their education requirements, a graduate must pass a mandatory examination. *Id.* at p. 225:3 to 225:6. In order to be able to practice as a physical therapist in the State of Alabama, one must successfully pass the National Physical Therapy Examination, which is administered by the Federation of State Boards of Physical Therapy in Alabama and other states. *Id.* at p. 225:8 to 225:13. Once in practice, a physical therapist in Alabama is required to complete every year ten contact hours of continuing education. *Id.* at p. 226:1 to 226:4.

The question remains, what does a physical therapist do with this knowledge and training? The following is an answer to that question presented at trial, which the court adopts:

A physical therapist, when a patient comes to them, must first collect some general information from that patient, usually in the form of history, perhaps in the form of other documentation that they may receive. And then they must do their own physical examination of that patient to determine what the underlying system impairments are and what functions the person can't carry out. Then based on that examination, the therapist undergoes a cognitive process where they synthesize all of that data that they collected themselves, boil it down to what is most important, and develop a problem list for the patient as a result of this cognitive evaluation process that goes on in the therapist's brain. Then based on the evaluation, a physical therapy diagnosis is made.

Based on a number of factors that the patient expresses and factors that show up in the physical examination, the therapist then determines what the prognosis for improvement of those problems is

in the context of that individual patient and then designs a plan of care and implements that plan of care and then reevaluates the patient on an ongoing basis to customize that care and change it, if necessary, ultimately working toward outcomes, meaning that the patient improves, measuring how well the patient improves.

Transcript at p. 226:19 to 227:15.

Thus, a physical therapist evaluates, makes a diagnosis, reaches a prognosis, designs a plan of care, implements a plan of care, and reevaluates this plan of care on an on-going basis, altering it if necessary, all directed towards providing care that improves the patient's condition.

In arguing that physical therapists are not professionals, the Plaintiff points out that a physical therapist in the State of Alabama may only practice his skill upon a referral from a licensed physician or a dentist. *See* Ala. Code § 34–24–191(a)(1) (1975). The testimony presented at trial, however, established that in the overwhelming majority of cases this referral consisted of little more than a request from the physician or dentist for evaluation and treatment of the patient:

From my own personal experience as a therapist and also talking to other therapists that offer clinical education for our patients and in some of the clinical practices that I've been in, most physicians, the referral consists of a prescription pad that just has the patient's name and date. And it will say, physical therapy, evaluate and treat. Very rarely the referral may be prescriptive and say exactly what the person wants. I'm just guessing that that might be—you know, one out of a hundred referrals may be prescriptive in that way. The rest are simply evaluate and treat.

Transcript at p. 227:24 to 228:11.[9]

Accordingly, physical therapists exercise a great deal of discretion in treating patients. *Id.* at p. 74:2 to 74:8, p. 228:18 to 229:11; *see also id.* at p. 176:12 to 176:25, p. 180:5 to 180:12. From the therapist's standpoint, receiving these evaluate and treat referrals "means that the therapist is responsible, as he would be even if there were a prescriptive order given[10] . . . for going through that process . . . described earlier of examination, evaluation, diagnosis, prognosis, plan of care, and determining outcomes." *Id.* at p. 228:13 to 228:17.

Physical therapists are trained to be able to make instantaneous decisions, assessments and responses, regarding patient care involving not only cardiopulmonary resuscitation ("CPR") but also broader training to enable them to make a general assessment of what is happening with the patient. *Id.* at p. 179:4 to 179:25; *id.* at p. 230:18 to 231:16. Discussing the instantaneous decisions that a physical therapist must make as part of treating or examining a patient, Dr. Fell notes the following:

> [I]n the midst of your physical examination you may detect something in a patient, like the rate of their heartbeat or an abnormal rhythm of their heartbeat when you listen to their heart or feel their pulse, that would indicate that you need to address that immediately without going through the rest of the physical exam. So you may need to address—have discretion and make an important clinical judgment in the midst of the examination.
>
> Also, during the evaluation, as you're synthesizing all that information, you may put two or three signs together. And that would indicate to you this is something that needs to be dealt with now. It's not just one simple problem. It's more of a syndrome that requires immediate attention.
>
> In the plan of care, as you're delivering therapy, therapists are taught that they need to continually monitor the patient's response to the exercise or activity that they're carrying out. And as a result of that, they need to be aware if there's a problem, know what problems they need to be looking for in a particular type of patient, and then be prepared to respond to that.

*Id.* at p. 230:22 to 231:16.

Physical therapists perform delicate procedures that also require them to exercise

---

9. Other evidence was presented in addition to Dr. Fell's testimony regarding the types of referrals received by physical therapists. Barnes testified as follows:
 Q. Typically, when a physical therapist receives a referral from a doctor, how specific is the doctor with respect to what you're supposed to do to the particular patient that's being referred to you?
 A. The—typically, the referral comes to us to evaluate the patient and treat the patient as we deem necessary.
 Q. So the doctor will essentially say, I'm referring Joe Jones to you for a knee injury; you are to evaluate and render therapy?
 A. That's correct.

Transcript at p. 73:11 to 73:20.
 Dale Yake testified that "[f]or the most part, I would believe probably 80 percent of my referrals say evaluate and treat." *Id.* at p. 173:11 to 173:12.

10. Dr. Fell testified that "even if the patient is referred to us with a prescriptive referral that tells us exactly what to do, under our state licensure, we are still responsible to make sure that what we administer to the patient is appropriate. And we're called upon . . . to refuse to do something that we think is not in that patient's best interest." *Id.* at p. 234:12 to 234:17.

their judgment, such as when performing sharp debridement, a form of wound treatment, in which a physical therapist determines how deep to cut with a scalpel to remove the dying tissue, but avoiding cutting so deep that the therapist removes healthy skin. *Id.* at p. 232:3 to 232:13. For the treatment of incontinence in women, physical therapists perform electrical stimulation of the muscles of the pelvic floor by inserting electrodes into the vagina. *Id.* at p. 232:14 to 232:20. Physical therapists also administer medication, most commonly anti-inflammatory agents that are administered through two procedures, iontophoresis, where an electrical current is used to drive that drug through the skin into the deeper tissues, and phonophoresis, where the drug is driven through the skin by the use of heat and increasing the temperature. *Id.* at 233:11 to 233:20.

As previously indicated, the Alabama Supreme Court has "stated several relevant factors to be considered in resolving the issue as to what constitutes a profession: professional training, skill, and experience required to perform certain services; delicate nature of the services offered; and the ability and need to make instantaneous decisions." *Friddle,* 575 So.2d at 1039.[11] Having reviewed the legal arguments and facts presented, the court concludes that to become a licensed physical therapist in the State of Alabama one must complete extensive training and graduate educational requirements. The court further concludes that physical therapists exercise a professional skill in the public interest that requires delicacy of skill and the ability to make instantaneous decisions. Although physical therapists may only act with a referral from a physician or dentist, they exercise tremendous discretion and professional skill and judgment in evaluating, making a diagnosis, reaching a prognosis, designing, implementing, re-evaluating, and modifying patient care. Physical therapists have a relationship of trust and duty that exists between their patients and themselves, where the patient should be entitled to trust that physical therapist is exercising reasoned professional judgment as to the patient's care. Accordingly, considering all of the evidence and arguments presented, the court concludes that physical

---

**11.** In *J.E. Hanger, Inc. v. Scussel,* 937 F.Supp. 1546, 1557 (M.D.Ala.1996) (internal citations omitted), Magistrate Judge Carroll of the Middle District of Alabama considered whether prosthetists and orthotists are professionals under Alabama law. "In examining the three [*Friddle*] factors listed above, this court finds that orthotists and prosthetists are not professionals as that term is defined under Alabama law. First, they do not require professional training, skill, or experience. Indeed, the practice of orthotics and prosthetics is not subject to licensure requirements or government regulations by the state of Alabama or the Federal Government. In addition, 'fewer than 30 individuals are certified in orthotics by the [American Board for Certification in Orthotics & Prosthetics, Inc. (ABC)],' while there are in excess of 500 providers. Further, over half of the prosthetists and orthotists in Alabama do not have a college degree.... Second, this is not a trade which requires the ability and need to make quick decisions. From the testimony elicited at the hearing, it appears as though a 24 hour turn around time is considered quick for the servicing of a device. Third, the court is not convinced that this service is delicate in nature, especially as compared to the nature of the law or medicine. In those professions, life and liberty are at stake. In the trade at hand, however, nothing as crucial is at stake. There is a delicacy in dealing with customers—but that is true for any trade. For these reasons, the court finds that prosthetists and orthotists are not professionals. Therefore, an injunction will not offend the public interest in Alabama."

therapists are professionals for the purposes of validity and applicability of non-competition agreements under ALA. CODE § 8–1–1 (1975).

As stated previously, Section 8–1–1(a) provides for a general prohibition on covenants not to compete, subject only to the limited exceptions provided by sub-sections (b) and (c) of Section 8–1–1. Because a physical therapist as a professional cannot fall within either of these statutory exceptions, the general rule that non-compete agreements are invalid applies; therefore, physical therapists are not subject to non-competition agreements. *See Cherry, Bekaert & Holland*, 582 So.2d at 505 ("[b]ecause the present case involves a professional, an accountant, the exceptions contained in subsections (b) and (c) do not apply, and we are left with the general prohibition of covenants not to compete.").

### E) What is the Scope of the Exclusion of Professionals from Non–Compete Agreements?

■ The court offered guidance to the attorneys as to an issue that should be explored in their post-trial briefs: "I'm also interested in hearing from both sides about whether, if a professional exemption applies, how extensive such a professional exemption is and does it extend beyond the actual performance of the professional skill to other things or is it limited to that, and what cases have had to say about that, if they have." *Id.* at p. 218:18 to 218:23. The question before the court is one of line drawing, that is, where does protecting the public interest in a physical therapist being able to practice his profession end and where does going too far into the realm of creating a blanket status protection for professionals, in this case physical therapists, begin.

The Defendant suggests that the line should be drawn as follows:

[T]here should be no dispute that the performance of 'hands-on' physical therapy comes within the scope of the practice. If Barnes engages in hands-on physical therapy practice, whether as an employee, a sole proprietor, a partner with others or as an officer of a legal entity, he most certainly is engaged in the practice of physical therapy. The practice of physical therapy should also encompass the solicitation of patients through such activities as calling on doctors, hospitals, or other medical providers who are a source for patients or rendition of therapy services.

Barnes' suggests, however, that even if he does not perform hands-on physical therapy on a full-time basis, he may nevertheless engage in other activities as a constituent part of the practice of his profession. For example, if he were to teach physical therapy, as does Dr. Fell, he would be practicing his profession. Similarly, if he were to serve in a consulting capacity for physical therapy practices providing professional consultative service, he would be engaged in his profession. If Barnes were to purchase a physical therapy practice or were to become a co-owner of the practice and if he thereafter engaged in direct supervision and management of the practice he would still be engaged in the performance of his profession even though he may not perform hands-on therapy.

Barnes suggests that in defining the scope of the practice of physical therapy the line should be drawn at the point that he ceases direct supervision and management of a physical therapy practice and engages predominantly in ac-

quisitions of physical therapy practices for investment purposes. If he acquires a physical therapy practice and thereafter does not exercise substantial direct management responsibilities then he has crossed the line and is no longer engaged in physical therapy with respect to these activities. Thus, Barnes suggests any Order to be fashioned in this case should recognize that, within the restricted geographic areas, the covenants do not bar Barnes from performing hands-on physical therapy or from acquiring or obtaining an ownership interest in physical therapy practices so long as his involvement therein entails direct supervision and management of the practice. Barnes should also be permitted to contract and solicit physicians, hospitals or other providers of physical therapy services in order to secure patients or other business for the performance of physical therapy services.

... As long as the performance of physical therapy by Barnes involves hands-on physical therapy and/or the direct supervision and management of a physical therapy practice, he should be permitted to do so without being subject to any of the restrictions in the non-compete agreements. Only if Barnes acquires an interest in physical therapy practices for investment purposes and over which he does not exercise substantial management and supervision should the covenants have any field of operation.

Post–Trial Brief of Defendant Rocky Barnes at 10–12.

If the court determines that physical therapists are professionals, the Plaintiff offers the following line as the outermost boundary of this exclusion:

[T]he [D]efendant should be excused from his bargained-for restrictions only so far as necessary to protect the public's interest in access to physical therapy services. The governing statute, *Alabama Code* Section 34–24–190, defines 'physical therapy' solely in terms of patient treatment, with absolutely no mention of management, marketing, financial or any other business functions. The evidence at trial was undisputed that staff therapists, such as those employed in hospitals, provide hand-on physical therapy services and nothing else. These staff therapists are not required to develop referral sources, market their company, negotiate contracts with other providers, evaluate acquisitions or perform any managerial tasks. They only provide physical therapy services—satisfying the public's only interest.[12] This should be the outermost limit of any exception. Plaintiff's Post Trial Brief at 18.

In response, Barnes argues the following:

In suggesting how this Court should craft an injunctive order that would permit Barnes to engage in the practice of his profession but would bar him from business activities, Benchmark argues that Barnes should be permitted only to render direct, hands-on physical therapy services to patients. Under Benchmark's rationale, Barnes should not be permitted to develop referral sources, market a company, negotiate contracts

---

**12.** The Plaintiff, elaborating on the public's interest, states: "In fact, a staff physical therapist best serves the public interest because their energies are devoted exclusively to providing physical therapy and are not divided with marketing, finances, acquisitions and other business functions in which the public has no interest." Plaintiff's Post Trial Brief 18–19 n. 5.

with other providers, or perform any managerial tasks. Such a court imposed restriction upon Barnes' activities would be nonsensical, unworkable and would completely disregard the practical aspects of rendering physical therapy services.

If this Court were to limit Barnes' practice of physical therapy in the manner suggested by Benchmark, then Barnes would be unable to set up a solo practice of physical therapy. He could treat patients but could not contract physicians to obtain referrals or to discuss a patient's progress, he could not send out a brochure or solicitation letter, he could not place a listing in the Yellow Pages, he could not hire another physical therapist to work with him, he could not supervise physical therapy assistants, he could not write payroll checks, he could not handle personnel matters and he could exercise absolutely no managerial responsibilities. The net effect of such a restriction would be that Barnes could not earn a living because he could not generate a patient base or manage his practice. A restriction of this nature would eviscerate the professional exception.

Barnes has suggest in his post-trial brief a reasonable dividing line between the practice of physical therapy (which cannot be restrained) and the conducting of business activities which could be the subject of reasonable restrictions). Barnes should only be barred from engaging in competitive activities beyond the scope of the practice of physical therapy if he acquires or obtains an interest in a physical therapy practice over which he does not exercise substantial direct management and supervision.

Post–Trial Reply Brief of Defendant Rocky Barnes at 4–5.

Alabama has a shortage of physical therapists. Eric Foust, Benchmark's Regional Vice President for the South Region, indicated that there are not a lot of physical therapists in the marketplace. Transcript at p. 115:12 to 115:17. Mike Ellis, Benchmark's Area Vice President of the State of Alabama, agreed that physical therapists were scarce and difficult to find. *Id.* at p. 100:6 to 100:13. Dale Yake, a physical therapist and athletic trainer, testified that there is a shortage of physical therapists in the State of Alabama. *Id.* at p. 180:13 to 180:16. Dr. Fell stated that there are 1,641 licensed physical therapists in the State of Alabama, but indicated that there is still more of a demand for physical therapists than can be met by the supply. *Id.* at p. 224:11 to 224:24.

The purpose of Alabama freeing professionals from the restraints of non-compete agreements is that such restrictions are contrary to the public's interest. *See Odess*, 211 So.2d at 810. In creating this exclusion, the courts have "noted that an important distinction must be drawn between the **practice** of a profession and the transaction of other types of businesses." *Thompson*, 391 So.2d at 1020 (emphasis added); *Odess*. 211 So.2d at 811 (finding that Alabama legislature did not intend for "one practicing a profession" to be subject to a non-compete agreement). Restrictions that tend to deny the public in the affected area access to a trained professional have repeatedly been struck down by the courts as unenforceable on public policy grounds. *Anniston Urologic Associates, P.C. v. Kline*, 689 So.2d 54, 60 (Ala.1997). The Alabama Courts are not creating a status protection that turns professionals into a sort of protected class that may enter into and then disregard non-compete agreements; rather, the Alabama courts are preventing non-compete

agreements from restricting professionals from providing their services to the public. *See id.* For example, a doctor is not protected from the restraints of any non-compete agreement simply because he is a doctor. If so, if he were selling a restaurant, the restriction on enforcing a non-compete agreement would apply. A doctor is, instead, protected only in his practice of medicine, for the purpose of the protection is the interest of the public in being able to receive the doctor's professional services.

The Plaintiff's view of the scope of this exclusion, which it essentially limits to the core skill exercised by the professional, is too narrow. The Alabama Supreme Court found that an attorney, who started a new competing law firm with himself as a named partner, fell within the professional exclusion. *Pierce v. Hand, Arendall, Bedsole, Greaves & Johnston,* 678 So.2d 765, 766–67 (Ala.1996). The Alabama Supreme Court did not limit Pierce to working as a contract lawyer, requiring him to work exclusively drafting, researching, advocating before courts, in order for him to qualify for the professional exclusion; rather, it allowed Pierce under the professional exclusion to start his own law firm with two other named partners. *See id.* As for physicians, the court rejected an argument that the professional exclusion did not apply to physicians practicing within a corporation organized under the Alabama Business Corporation Act. *Anniston Urologic Assocs.,* 689 So.2d at 59, n. 3. Being the head of the Ear, Nose, and

Throat ("ENT") Department for a Birmingham Clinic [13] and opening up one's own private practice [14] are also within the category of being a practicing physician. The Alabama Supreme Court did not require the physicians to take positions as a contract staff physician, as a doctor who exclusively treats patients, in order to qualify for the professional exclusion. *See Odess,* 211 So.2d at 810–12; *Associated Surgeons, P.A. v. Watwood,* 295 Ala. 229, 326 So.2d 721 (1976); *Anniston Urologic Assocs.,* 689 So.2d at 60.

It is possible to minimize the non-core skill work performed by physical therapists by, for example, requiring them to take jobs as a staff physical therapist, just as it would be possible to limit a lawyer, physician, accountant, or veterinarian to working in a manner that maximizes the use of their core skills and minimizes the amount of non-core work. *See* Transcript at p. 88:10–89:05, 109:20–110:20, 240:19 to 240:25, 242:03 to 242:07. Alabama law, however, does not require professionals, in order to qualify for the professional exclusion, to pursue an avenue that only allows them to perform the core skill of their profession. *See, e.g., Pierce,* 678 So.2d at 766–67; *Odess,* 211 So.2d at 810–12; *Associated Surgeons, P.A. v. Watwood,* 295 Ala. 229, 326 So.2d 721 (1976); *Anniston Urologic Assocs.,* 689 So.2d at 60. Thus, Barnes may open a solo practice as a physical therapist or even start a physical therapy firm providing hands-on services himself, while also managing the operation of the practice.

**13.** Dr. Odess was unable to enforce his non-compete agreement to limit Dr. Taylor, who had been associated with him in an ENT practice. *Odess,* 211 So.2d at 808–09.

**14.** *Associated Surgeons, P.A. v. Watwood,* 295 Ala. 229, 326 So.2d 721 (1976). *Anniston*

*Urologic Assocs.,* 689 So.2d at 60. (concluding that Anniston Urologic Associates could not prevent Dr. Kline from opening up his own medical office in the same building and competing with his former employer).

There are certain activities extending beyond the core skills of physical therapy that are reasonably attendant or concomitant with the operation of a solo practice or practice within a corporation providing a physical therapy service to the public. Examples provided by Barnes include "contact[ing] physicians to obtain referrals or to discuss a patient's progress, . . . send[ing] out a brochure or solicitation letter, . . . plac[ing] a listing in the Yellow Pages, . . . hir[ing] another physical therapist to work with him, . . . supervis[ing] physical therapy assistants, . . . writ[ing] payroll checks, . . . handl[ing] personnel matters[,] and . . . exercis[ing] . . . managerial responsibilities." Reply Brief at 5. The following colloquy between Defense Counsel and Benchmark Regional Vice President Faust addresses one of the most basic and obvious accompanying activities that is part of providing this service:

Q. Let's assume that Rocky Barnes today went out and opened up a physical therapy practice. In order to earn a living performing physical therapy practice, do you have to get patients?

A. Yeah. You have to receive patients.

Q. And you understand in the state of Alabama, don't you, that in order to obtain patients, you have to have a referral from a physician or a dentist?

A. Yes.

Q. So if an individual sets up a solo physical therapy practice in addition to performing hands-on physical therapy, that solo practitioner has got to get business, doesn't he, or he's not going to earn a living?

A. Yes.

Q. And is the way that you get business when you are a physical therapist is that you call on doctors?

A. Yeah. In that solo practice, though, I think you'd qualify that person as a business manager as well as a staff physical therapist.

Transcript at p. 110:21 to 111:14.

Dr. Fell, in response to a question asking whether he considered calling doctors to encourage them to refer patients to be part of the practice of physical therapy, answered:

Not just myself, but that's part of the profession itself, the viewpoint of the profession. There's a publication by the American Physical Therapy Association approved by the APTA House of Delegates called the Guide to Physical Therapist Practice. And it very clearly outlines that physical therapists may practice in a number of different venues including management of a physical therapy facility or, in my case, education, or consultation, where there's not even actually any hands-on care delivered to individual patients but just consultation to an institution or a facility or a factory. And in any of those cases, the person is practicing physical therapy.

*Id.* at p. 236:10 to 236:20.

The professional exclusion does not exist, however, to benefit the professionals to the extent of completely freeing them to practice their profession in a manner that they deem best, independent of their former employer. In *Anniston Urologic Assocs.*, the court allowed enforcement of a covenant that required Dr. Kline to pay twenty-thousand dollars if he failed to give nine months' written notice of his intention to terminate his employment. *Anniston Urologic Assocs.*, 689 So.2d at 59–60. The court indicated that "[t]he record reflects that this requirement was intended by the

contracting parties to afford Anniston Urologic sufficient time in which to hire another physician and to otherwise provide for a smooth transition from one physician to another or, in the event nine months' notice was not given, to compensate the corporation for economic hardship caused by the failure to give such notice." *Id.* at 60. The court stated that it "fail[s] to see how enforcement of the ... covenant—by requiring Dr. Kline to continue to practice medicine as an employee of Anniston Urologic for nine months, so as to enable the corporation to retain another physician, or by requiring Dr. Kline, to in essence, pay compensation to the corporation for failing to give the required notice—violates the public policy underlying § 8–1–1(a)." *Id.* The court found that this covenant did not fall within the professional exclusion, thus was enforceable. *Id.* The court found that "[a]t no time would the enforcement of the first covenant have adversely affected the public by preventing Dr. Kline from treating patients in the geographical area in which he practices." *Compare id. with Cherry, Bekaert, Holland,* 582 So.2d at 504–07 (invalidating a covenant provision that, even though it did not explicitly contain a non-compete agreement, nevertheless, made it cost prohibitive for J. Charles Brown to pursue a client of his former accounting firm). Thus, the court "[i]n the absence of any clear public policy considerations to the contrary ... decline[d] to construe § 8–1–1(a) as voiding a duly bargained-for notice provision, such as the one at issue in this case." *Anniston Urologic Assocs.,* 689 So.2d at 60. Even though the provision interfered with the manner in which Dr. Kline wanted to practice his profession, that is, free of Anniston Urologic, the court found that there was no public interest served by invalidating this provision under the facts of the case. *See id.*

Accordingly, as the public interest is the reason for the protection of professionals, in drawing a line that divides conduct which falls within the scope of the exclusion from conduct that goes beyond the boundaries of the protection afforded, the court considers the facts presented in relationship to the public interest that is at stake. It is the public's interest in having Barnes' physical therapy services available to it, not Barnes' interest in engaging in business which is related to physical therapy, that allows Barnes to avoid restrictions in a non-compete agreement for which he bargained and for which he was paid. Also, however, the court seeks to frame the scope of the exclusion within the schema formed by the Alabama courts, which clearly have not required professionals to be angels, providing their services to the public in the purest form, but instead allowed them to operate competing firms, departments, and private solo practices, perhaps implicitly recognizing a Hamiltonian observation that a measure of self-interest can benefit the broader society.

The public interest is protected by having Barnes available to provide physical therapy services to patients who would otherwise not have that service available from him. This includes the necessary things involved in operating a practice, so that his personal services can be reasonably available, and he may do this in association with others. The public has no interest, however, in Barnes simply managing the business of other physical therapists whose services would be available whether Barnes were practicing his profession or not. It is with these concepts in mind that the court addresses the specifics of the extent to which the professional exemption applies to Barnes under the facts of this case.

Barnes can benefit the public interest by utilizing his professional skills through be-

ing a hands-on physical therapist, a solo-practitioner, a member or partner in a firm or association of physical therapists, or a manager or executive in a physical therapy facility where he does hands-on physical therapy, assuming that providing direct oversight or supervision to the actual exercise and practice of hands-on physical therapy within the facility is a significant component of his position. Within this practice, Barnes permissibly can solicit patients through such activities as calling on doctors, hospitals, or other medical providers who are a source of patients for his physical therapy services. Barnes, however, has failed to show to the court how his professional skill will benefit the public through allowing him to engage in the practice of expanding the business of a physical therapy corporation or association by making contracts and connections with other facilities to take over the management of or acquire their physical therapy facilities. He has also failed to present any evidence that such activities are reasonably attendant or concomitant with the practice of the profession. Therefore, he may not do so.

Barnes may act as a non-business related consultant, subject to restrictions. As for being a consultant to physical therapy facilities or practitioners, insofar as his consulting focuses upon providing physical therapy services, rather than business development or even obtaining clients, contacts, or business, this would be an exercise of his professional skill to the benefit of the public; otherwise, he has not shown how being a consultant would benefit the public through the practice of his profession. Furthermore, if consultation is with a competing facility or practitioner covered by the agreement, Barnes may not allow his name to be used by the competitor.

Barnes indicates that if he "acquires an interest in physical therapy practices for investment purposes and over which he does not exercise substantial management and supervision ... [that] the [non-compete] covenants have [a] field of operation." Post–Trial Brief of Defendant at 12. The court concludes that Barnes is correct that such conduct would transgress the scope of the professional exclusion, except to the limited extent that passive investment in public companies is authorized by the covenants, but emphasizes that the "substantial management and supervision" of a practice which the law requires in this context must include significant direct oversight and personal supervision of hands-on physical therapy itself, and not primarily management and supervision of the business aspects of a practice. Also, as discussed above, Barnes is incorrect insofar as he asserts that this is the only potential transgression of that boundary.

Barnes may serve as a teacher of physical therapy at an institution providing such instruction, as that would benefit the public interest.

Finally, Barnes has not demonstrated that the public would be served by freeing him from the provisions of the covenants prohibiting him from soliciting or hiring employees or officers of Rehab Associaties, or its related companies, and Barnes will be bound by those restrictions.

**2) Protectable Interest, Reasonableness of Limitations in Terms of Geographic Scope and Duration**

Having found that the non-compete agreements are unenforceable against Barnes to certain extents because of the professional exemption, the court now turns to the reasonableness of the geographic scope and duration of the limitations which continue to be enforceable, and to whether the business-related re-

strictions which are not rendered unenforceable by the exemption are nevertheless unenforceable in regard to persons or entities who were not pre-existing clients of Benchmark.

The Defendant argues that the parties' non-competition agreements are unenforceable to the extent that Benchmark does not have a protectable interest and that the scope of the limitation imposed upon Barnes is unreasonable in terms of time and place. The Alabama Supreme Court utilizes the same framework in analyzing the validity of non-compete agreements contained in purchase and employment contracts, and the Plaintiff's interest in enforcing these two non-competition agreements is intertwined. Therefore, the court considers the agreements together, drawing distinctions where warranted on the basis of the language of the contracts and variations in the Plaintiff's protectable interest with regard to reasonableness of geographic scope in agreements enforced against Barnes as a seller as opposed to an employee.

■ Assuming that the non-competition agreement is not otherwise void, as this court has held to be the case in regard to certain business-related aspects, Alabama courts will enforce the terms of a covenant not to compete if: (1) the employer or purchaser has a protectable interest; (2) the restriction is reasonably related to that interest; (3) the restriction is reasonable in time and place; and (4) the restriction imposes no undue hardship on the seller or

employee. *James S. Kemper & Co. Southeast, Inc. v. Cox & Assocs., Inc.,* 434 So.2d 1380, 1384 (Ala.1983) (applying this standard to an employment agreement) (citing *DeVoe v. Cheatham,* 413 So.2d 1141, 1142 (Ala.1982)), *Central Bank of the South v. Beasley,* 439 So.2d 70, 73 (Ala.1983) (applying this standard in sale of a bank, where one of sellers continued working for newly merged bank for one year); *Nationwide Mut. Ins. Co. v. Cornutt,* 907 F.2d 1085, 1087 (11th Cir.1990); *Ex parte Caribe, U.S.A., Inc.,* 702 So.2d 1234, 1236 (Ala. 1997). The determination of reasonableness is a highly case specific endeavor. *See Sheffield v. Stoudenmire,* 553 So.2d 125, 126 (Ala.1989). *Hill v. Rice,* 259 Ala. 587, 67 So.2d 789, 795 (1953). Under Alabama law, with regard to non-competition agreements, "[a]n unreasonable limitation or restriction may be stricken from the pertinent contractual provision, leaving the balance of the provision binding on the parties." *Cullman Broadcasting Co., Inc. v. Bosley,* 373 So.2d 830, 835 (Ala.1979); *see also Mason Corp. v. Kennedy,* 286 Ala. 639, 244 So.2d 585, 590 (1971) (holding that "a court of equity has the power to enforce a contract against competition although the territory or period stipulated may be unreasonable, by granting an injunction restraining the respondent from competing for a reasonable time and within a reasonable area.").

### A) Protectable Interest [15]

■ The Alabama Supreme Court explained that "[w]here a sale of good will is

---

**15.** The court finds unpersuasive the Defendant's argument that § 6.2 of the purchase agreement "supports the conclusion that the protectable interest of Benchmark does not extend to business opportunities." Post–Trail Brief of Defendant Rocky Barnes at 16. The court concludes that Benchmark in its vari-

ous corporate forms is in the business not only of providing physical therapy, but also of acquiring and seeking to take over management of existing physical therapy providers. Transcript at 122:06–125:10. In addition to providing a service, Benchmark is an acquisition corporation that grows through acquir-

involved, ... the buyer's interest in what he has acquired cannot be effectively realized unless the seller engages not to act so as unreasonably to diminish the value of what he has sold." *Greenlee v. Tuscaloosa Office Products and Supply, Inc.*, 474 So.2d 669, 671 (Ala.1985) (quoting RESTATEMENT (SECOND) OF CONTRACTS § 188, cmt. b (1981)). Accordingly, "[t]he extent to which the restraint is needed to protect the promisee's interests will vary with the nature of the transaction." *Id.* With respect to the acquisition of an on-going enterprise, the Alabama Supreme Court noted that "[g]ood will is not a thing apart, but an incident to and inherent in the thing itself—the business." *Kershaw v. Knox Kershaw, Inc.*, 523 So.2d 351, 358 (Ala.1988) (quoting *Wylie v. Wylie Permanent Camping Co.*, 57 Mont. 115, 187 P. 279, 281 (1920)). As for employment contracts, "[i]f an employee is in a position to gain confidential information, access to secret lists, or to develop close relationships with clients, the employer may have a protectable interest in preventing the employee from competing." *DeVoe*, 413 So.2d at 1143.

Barnes and Benchmark conceptualize the issue of protectable interest in two entirely different ways. Barnes discusses patients and how far they live from the clinics that they utilize. The Plaintiffs discuss their interest in terms of contacts, networking, and the possibility of expanding their business enterprises. The basic divide underlying the parties' differing conceptualizations is a divide over what constitutes the legitimate protectable interest, in the parties' purchase and employment agreements respectively. What Barnes sold to the Plaintiffs, according to Benchmark, in addition to the existing Rehab Associates structure, is the possibility of expansion, the use of Barnes' networking skills and contacts, and his efforts at growing the company beyond what it was, into what it could be. In other words, the acquisition was not a static customer list, but a dynamic opportunity for growing and expanding. The agreement between these parties is accurately interpreted as Benchmark purchasing the existing structure of Rehab Associates and its good name, which was intimately tied to the persona of Rocky Barnes, and employing Barnes to a great extent in order to utilize his contacts in expanding Benchmark's acquisition beyond its existing structure.

Three tiers, patients/doctors/customers, are implicated in this purchase and are of concern to Benchmark. One is the patients around individual physical therapy facilities, the second is referring physicians, and the third is physical therapy operations, facilities, and contracts for service providers and facility management. Benchmark's clients are not only patients, but physical therapy facilities themselves. In other words, Benchmark's concern is not exclusively that Barnes has connections and networking ability that enables him to provide business through Patient X, or even Dr. Y, but that Barnes has connections with administrators who are responsible for the entire physical therapy operations of hospitals, clinics, and physician groups. Barnes can in essence help generate business with an entire facility,

ing existing facilities and operations. *Id.* Consequently, in seeking to acquire business opportunities in the form of taking over management of or acquiring other physical therapy providers within the specified territory, without being personally involved to a signifi-

cant extent in the actual hands-on providing of physical therapy as previously allowed, Barnes would be in competition with Benchmark in violation of the restrictive covenant contained in the purchase agreement. Plaintiff's Exhibit 103, Purchase Agreement § 6.2.

not just a doctor or a patient.[16] In its post-trial brief, the Plaintiff described its interest as follows: "Barnes' customers were not individual patients, but instead were Rehab Associates' referring physicians and the business partners with which it contracted to provide physical therapy in hospitals, manage other physical therapy businesses, and actually purchase other physical therapy businesses." Plaintiff's Post–Trial Brief at 6.

To the extent discussed above, the professional exclusion renders the non-compete agreements inapplicable to Barnes. The Defendant contends that the non-competes should be further invalidated to the extent that Benchmark's protectable interest cannot extend beyond "pre-existing business relationships between Benchmark and its patients, clients or customers in a defined geographic area. It cannot have a protectable interest to protect it from com-

**16.** Rick Binstein, the general counsel for Benchmark, who is a lead figure in Benchmark's acquisitions, offered the following testimony regarding the purchase of Rehab Associates from Defendant Barnes:

Q. Why was Benchmark interested in acquiring Rehab Associates?

A. Well, Benchmark's growth strategy is to look to regions and markets where we can find an established company that has significant growth potential.... [T]he key is to find a business that has a solid local reputation and a foundation for growth. So we were looking to expand our business base. We didn't have anything in the South—Southeast. And Rehab Associates and Rocky, you know, in this industry, has been known by everyone.... And it really was a perfect acquisition for Benchmark, given Rocky and given, you know, his success and what through him he had been able to develop and what we knew and he knew he would be able to continue to grow.

Transcript at p. 123:25 to 124:16.

Q. What was unique about this that justified the increased multiple [ (Benchmark paid a higher purchase price than it normally would pay in order to acquire Rehab Associates) ]?

A. Well, I mean Rocky, you know, is a very charismatic guy. He just in this region had just innumerable relationships. Everyone knew him. The industry knew him. As someone mentioned before, he was forming—the original founder of the rehab network in this area. I mean Rocky was essentially an icon in this part of the country. Benchmark was a growth company looking to acquire companies that could grow with us. So—so as we evaluated this acquisition, you know, we went through a process and concluded that with all of the growth that—in negotiating and working with Rocky and understand-

ing him and what he's all about and what he saw he could do in terms of growing this business if linked with us and our capital, it justified in our mind paying the purchase price that we agreed to.

*Id.* at 127:4 to 127:19.

Q. And was Mr. Barnes' employment a condition of the sale?

A. Absolutely.

Q. Why?

A. Because what we were buying was Rocky, really, in the sense of we were buying his reputation, the goodwill that he had developed over his 15 or 20 years, whatever it is, and the ability to have him stewarding this business in the Southeast where we had no presence. And so I mean Rocky is part of this transaction. I mean he was the cornerstone of the transaction. Him being part of it was absolutely—there would be no deal if he wasn't part of it.

*Id.* at p. 127:25 to 128:10.

Q. And was Mr. Barnes' agreement to the noncompetition provision a condition of the sale?

A. Absolutely.

Q. Why was that so important to the sale?

A. Well, again, there would be no sale without this provision. You know, what we were buying was Rocky Barnes, what he had developed, what his name means in this region, what he means in this region, the relationships that he's cultivated, that he has the ability to continue to—to grow and cultivate. And so we simply would never buy this very successful, large, regional southeast company without Rocky, A, being part of us and without the certainty of knowing that Rocky wouldn't, you know, be able to do something that just fundamentally takes away what we were buying into the future.

*Id.* at p. 129:2 to 129:15.

petition for future business opportunities." Defendant's Post–Trial Brief at 18. The court does not agree.

The Alabama courts have enforced agreements that impose a ban on competing within a certain geographic area and have not limited these agreements to only applying as to pre-existing customers or clients. For example, in *Booth v. WPMI Television Co., Inc.*, 533 So.2d 209 (Ala. 1988), the Alabama Supreme Court enforced a covenant not to compete not only as to soliciting former customers that Booth worked with in selling advertising for the WPMI television station, but additionally allowed to stand a restriction that prevented Booth from working at all for any television station within the reach of WPMI's broadcast signal, sixty miles. *Id.* at 211. In *Cent. Bancshares of the South, Inc. v. Puckett*, 584 So.2d 829, 831 (Ala. 1991), the Alabama Supreme Court found "that the restriction regarding competition in the banking business is reasonably related to Central Bank's protectable interest, because the restriction is designed to protect Central Bank only in the area in which it has a legitimate interest: the banking industry." *Id.* The court enforced this restriction as to· the entire banking industry throughout the State of Alabama without limiting the restriction to pre-existing banking customers. *See Id.* at 831–32.

Also, knowledge of potential customers, possessed by an individual responsible for soliciting customers for his former employer, was identified as a protectable interest of Kemper, a lumber industry company, in relation to restricting actions by its former salesman, solicitor, and servicing agent, Tillery, who supervised Kemper's business in Alabama. *James S. Kemper & Co. Southeast, Inc.*, 434 So.2d at 1382. "Through Kemper, Tillery was able to learn every customer and **potential customer** for lumber industry casualty insurance in Alabama. Such information and the clientele acquaintance involved clearly constitute a protectable interest of Kemper." *Id.* at 1384 (emphasis added). In both *Booth* and *Kemper*, the individuals subjected to the restrictive covenants with regard to potential customers were individuals with connections and networking skills that had been put to use for their employers. In *Cent. Bancshares*, the individuals were two of the top five executives of the banking corporation. Even if restrictions on competition for prospective customers, not only pre-existing customers, is only broad enough to only include top level executives or individuals who have solicited customers and who have connections that would enable them to compete with the purchaser of their enterprise or their former employer, Barnes, as discussed above, certainly falls within this category.[17]

The Defendant cites to *Kershaw*, in support of his proposition that this is not a

17. Foust offered the following testimony regarding why Benchmark considered Rocky Barnes to be so important to their business development:

A. Rocky was so well known throughout this region, he just—people down here know Rocky's name pretty well. He was much more efficient at gaining new business relationships or new business opportunities than somebody like myself that's only been working in the South for a little over

two years or anybody else on our team coming in from Philadelphia trying to start up relationships. It's pretty simple for Rocky to get a return phone call from a business owner or a hospital administrator to serve up new business, whereas, you know, I would try multiple times before even getting a return phone call—or anybody else in the organization, for that matter. And also, through how well people knew Rocky and the person that he was in

protectable interest. The Alabama Supreme Court in *Kershaw* invalidated a provision that prevented competition "within any county or province within the United States and Canada in which [KK, Inc.] ... *shall* do business at any time during said five (5) year period." *Kershaw*, 523 So.2d at 359. The defendants argued that this non-compete agreement was overbroad and ambiguous because they have "no way of knowing where KK, Inc., might do business in the future." *Id.* The court agreed. *See id.* It invalidated the provision for being overbroad and ambiguous, because the provision prevented competition in unidentifiable business areas, subjected a party to the future decisions of the purchaser, and prevented competition for customers over new railway companies that did not exist when the agreement was made. *Id.* This decision does not lead to the conclusion that only pre-existing customers can provide a protectable interest. *See id.*

Rather, the covenant in *Kershaw* was invalid because it created an impermissible framework, because as stated by the defendants, they had "no way of knowing where KK, Inc., might do business in the future." *Id.*

In support of its argument that only pre-existing, not prospective, customers can be a protectable interest, the Defendant also cites to *Nationwide Mut. Ins. Co. v. Cornutt*, 907 F.2d 1085, 1088 (11th Cir.1990). Specifically, the Defendant references the proposition that "[t]o secure enforcement of a non-compete clause within a particular territory, the employer must demonstrate that it continues to engage, in that locale, in the activity that it seeks to enjoin." *Id.* This citation is illustrative of the divide underlying the Plaintiff's and Defendant's concept of what activity the Plaintiffs are engaging in and who the clients/customers are. Bench-

this field through the Rehab Associates business that he had grown and built, he would get spontaneous phone calls still, too.

Q. From people seeking to do business with Benchmark?

A. Right. Actually, seeking to do business with Rocky. And that was a part of Benchmark.

Transcript at p. 106:02 to 106:15.

Regarding Barnes' influence, Ellis testified:

Q. What is your assessment of Mr. Barnes' influence in this industry in the state of Alabama?

A. Very large. Mr. Barnes was very instrumental in the growth of the private practice of physical therapy, not only in Central Alabama but throughout the state.

Q. Does he have activities in Georgia?

A. Yes, sir. Yes, sir.

Q. From your experience, explain what harm would come to Rehab Associates as it's now owned by Benchmark if Mr. Barnes is able to compete head to head in this area.

. . . . .

A. I'm sorry. Could I ask you to repeat it, please, sir?

Q. Well, based upon your time in Alabama in the physical therapy industry and your experience working with those in this industry, from your perspective, explain what harm would come to Rehab Associates, as it's now owned by Benchmark, if Mr. Barnes is permitted to compete head to head without any restrictive covenant that currently may exist.

A. It would be a competitor to reckon with.

Q. Why do you say that?

A. Mr. Barnes' relationships are long standing. There's a lot of history, a lot of success behind the name. The foundation of the company was built on his time put forth many years ago. His relationships within this market are vast.

*Id.* at p. 90:3 to 91:4.

mark, in addition to treating patients in its physical therapy facilities, as indicated above, is engaged in the business of trying to sell its management services and physical therapy services to hospitals and other providers, and to acquire other physical therapy facilities. Its business exists on more than one plane. The business of Benchmark, as indicated above by Binstein, included acquisition of other physical therapy facilities. Benchmark was engaged both before acquiring Rehab Associates and after its acquisition of Rehab Associates in selling its management services and physical therapy services and acquiring large scale physical therapy operations. Though the parties disagree over how much of Barnes' job involved these activities, it is undisputed that he was involved in these expansion efforts on behalf of Benchmark as its employee, after the acquisition of Rehab Associates.[18] Simply stated, the employer/purchaser

18. The following exchange occurred between Plaintiff's counsel and Barnes.

Q. Well, in that regard, you were going to be active related to trying to grow Benchmark, or Rehab Associates, throughout the South, weren't you?
A. That was something that I was to do on— in addition to.
Q. To try to seek out—add additional facilities.
A. That's correct.
Q. And in fact, within your contract, you had acquisition incentives.
A. Yes, sir.

. . . . .

Q. Let me show you what's marked as Plaintiffs' Exhibit # 129. Mr. Barnes, can you identify Plaintiffs' Exhibit # 129?
A. These are various development charts.

. . . . .

Q. Well, the ones that were sent to you, they were sent to you while you were working for Rehab Associates after the purchase by Benchmark?
A. I believe so.
Q. And you received these as a regular part of your job, didn't you?
A. As a regular part of my job?
Q. Yes.
A. I wouldn't characterize it that way.
Q. Well, part of your job was to call on prospects, wasn't it?
A. It was.
Q. And this is a prospect list or development list?
A. Yes, sir.

. . . . .

Q. And this might be a potential acquisition or source of business for Rehab Associates, or the plaintiff in this instance.

A. Yes, sir.
Q. And your job in part was to make calls such as these on prospects.
A. That's correct.
Q. And for example, this would be a prospect in Chattanooga, Tennessee?
A. Yes, sir.
Q. See that? And if you look down the list, it talks about R. B., meeting. Do you see that?
A. Yes, sir.
Q. And there are several meetings that are shown. And this would show meetings in Montgomery; Columbus, Georgia; Birmingham, Alabama. Do you see that?
A. Yes, sir.
Q. So you might be going to these various cities to have these meetings as a possibility of securing additional business.
A. Yes, sir.

. . . . .

Q. All right. In exploring acquisitions on behalf of Rehab Associates after Benchmark purchased them, you visited a number of cities or made contacts with facilities in a number of other Georgia cities, didn't you?
A. For—
Q. On behalf of Rehab Associates after the purchase by Benchmark.
A. Yes.
Q. And you made contacts with facilities in Tifton, Georgia?
A. Yes.
Q. And we noted on this map in blue pens those that would be contacts. Macon, Georgia.
A. Correct.
Q. Vidalia, Georgia?
A. I can't remember Vidalia.
Q. Do you remember communications with Ms. Nancy Stanley, owner of Toombs County Physical Therapy, in Vidalia, Georgia?

continues to engage in this business. Considering all of the above, the court finds that, while Barnes is free to solicit business from both pre-existing and potential future sources to the extent that his activities are held to be exempt by virtue of being related to his provision of actual physical therapy services personally, the restrictions on business-related activity which are held to be enforceable apply to future business opportunities, as well as pre-existing business relationships, within the protected territory for the enforceable time.

### B) Geographic Scope

■ Benchmark does not seek to enforce the nationwide limitation contained in its employment agreement with Barnes.

A. If that's in Vidalia, yes.
Q. Okay. How about Thomasville, Georgia?
A. I don't believe so.

. . . . .

Q. Let me show you what appears to be a letter from you dated May 1, 2002, to Earl Folsom in Thomasville, Georgia.
A. Okay.
Q. Mr. Barnes, does that refresh your recollection that you were calling on someone in Thomasville, Georgia, for the purpose of seeking business activity for Rehab Associates in May of 2002?
A. It does.

. . . . .

Q. So indeed in 2002, January of 2002, you were making contacts in Gainesville, Georgia, about potential business activity.
A. Yes, sir.
Q. And then also, as well, Statesboro, Georgia.
A. I mean you would have to refresh my memory every time with these, I'm afraid. I'm sorry. I made a contact over there before as well. (Brief pause)
A. Yes.
Transcript at p. 46:25 to 55:07; *see also* Plaintiff's Exhibit 129.

**19.** During the trial, Mr. Vreeland, counsel for Plaintiff, informed the court of the following:

During the course of the trial and in its post-trial brief, the Plaintiff stated that it seeks an injunction that restricts Barnes from acting within seventy-five miles of its clinics, rather than to impose the nationwide restraint set forth in the employment agreement.[19] Barnes argues that the enforcement of the seventy-five miles restriction will cause an undue hardship, because "[u]nless the reach of the covenants is narrowed, Barnes will be banished from practicing his profession in virtually all of Alabama except the southwest corner of the state." Defendant's Post Trial Brief at 24. It is unnecessary for the court to address this argument, as Barnes under the professional exclusion and consistent with this opinion may practice his profession anywhere in the State of Alabama.[20] Barnes also argues that "whether viewed

MR. VREELAND [ (counsel for Plaintiff) ]: ... We would agree that the 75 miles in the purchase agreement is a reasonable distance and that we could measure, you know, the prohibited territory, as it's called in some of the agreements.

THE COURT: And the employment agreement goes continent-wide. ·

MR. VREELAND: Correct, Your Honor. And rather than—they have complained that that's too vague to comply with. What we say is, okay, it's precisely defined in the purchase agreement as 75 miles from the clinics. We can—we believe that's a reasonable distance. Transcript at p. 14:09 to 14:24.

In its post-trial brief, Benchmark states "[w]hile the goodwill obviously reaches further, Benchmark does not ask for protection to its furthest extent, but only within the reasonable 75–mile radius around its existing locations." Plaintiff's Post Trial Brief at 11.

**20.** Insofar as his definition of his profession diverges from that set forth by the court, Barnes fails to show that being limited in this manner constitutes a hardship. Although the parties dispute whether this was a thirty million dollar purchase or not, it is clear that Barnes made three million dollars from this sale. Transcript at p. 36:20–36:23. Having been paid fifteen times the yearly salary that

from the perspective of the location of the patient base of the Benchmark facilities or from the location of the physicians who refer patients for physical therapy, a 75 mile radius around the Rehab Associates facilities is ... unreasonable ...." *Id.*

The court, however, does not measure using exclusively how far patients will travel or the reach of doctors' referrals; rather, the third tier customers implicated in this case are facilities and hospitals. Barnes, while working for Benchmark, went more than seventy-five miles beyond existing facilities seeking business from these customers for his employer. Transcript at p. 55:16 to 55:19. Binstein answered a question, regarding how the parties arrived at the seventy-five mile restriction in the following manner:

> The 75 miles was, you know, like a lot of the other terms in this deal, a negotiated term. Again, for us, in doing deals of this sort and for me personally doing deals of this sort, it was a fairly typical geographic scope, ... to protect us for a large area, which reflected an area, you know, consistent with his sphere of influence. I mean what we're talking about is, as I said, a leader who grew—... on his shoulders grew this business through relationships. And this is not relationships with patients within a little geography of a clinic. It's relationships in an entire region. So again, in order for us to pay the multiple, invest the dollars,

sort of paying up front six years' worth of earnings on day one, we needed to be assured that we would get our return. And in order to get our return, we needed Rocky and what we were buying, the goodwill of him and his reputation, to stay with us and not be against us in the entire region that he had a sphere of influence that we were buying. And so 75 miles was the mileage. And as I said, it was a term in the deal, it was a condition, and it was one of the negotiated points.

Transcript at 129:20 to 130:14.[21]

As discussed above, Benchmark has shown Barnes' extensive influence and contacts within the physical therapy profession in the Southeast. The Plaintiff contends that this influence extends throughout Alabama and Georgia. *See* Defendant's post trial brief at 10. The court agrees. *See, e.g.,* Transcript at p. 90:3 to 91:4, 106:2 to 106:15, 123:25 to 124:16, 127:4 to 127:19, 127:25 to 128:10, 129:2 to 129:15. In their briefs, the parties talk past each other as to where this seventy-five miles should be measured from, Benchmark suggesting its existing facilities, Barnes suggesting the Rehab Associates facilities.

The Purchase Agreement restricts competition "within seventy-five (75) miles of any of the facilities operated or managed by a Company as of the date hereof."

---

he was to receive working for Benchmark, with a non-compete agreement in the purchase agreement that is for five years and in the employment agreement for two years (the two agreements run concurrently), and still being able to practice his profession, the remaining restrictions on conduct outside the protection of the professional exclusion do not impose an undue hardship. *See* Plaintiff's Exhibit 104, Employment Agreement § 3;

*Central Bancshares of the South, Inc.,* 584 So.2d at 832; *Central Bank of the South v. Beasley,* 439 So.2d 70 (Ala.1983).

21. Barnes agreed that the seventy-five mile restriction was a negotiated term and that Benchmark was "pretty insistent" on a seventy-five or hundred mile, and despite his efforts to negotiate a smaller area, "they wouldn't go along with it." Transcript at p. 81:16 to 82:06.

Plaintiff's Exhibit 103, Purchase Agreement § 6.2. The "THIS PURCHASE AGREEMENT" section of the agreement, which precedes § 1, indicates that "RA LLC [ (Rehab Associates, LLC) ] and RA LLC's affiliated limited liability companies (including Rehab Xcel, LLC, Rehab Colorado, LLC and Rehab Missouri, LLC) are sometimes collectively referred to as the 'Companies' or singularly as a 'Company'.)" Thus, in the Purchase Agreement, Benchmark did not bargain for having seventy-five miles measured from its existing facilities, but instead from facilities operated or managed by Rehab Associates in its various corporate forms at the time of its sale to Benchmark. With regard to the Purchase Agreement, the court is persuaded that Benchmark has shown that the seventy-five mile restriction does not extend farther than is reasonably necessary to protect Benchmark's protectable interests and imposes a reasonable limitation in terms of geographic scope. *See Sheffield,* 553 So.2d at 126; *Robinson v. Computer Servicenters, Inc.,* 346 So.2d 940, 943 (Ala. 1977); *see also, e.g., Central Bancshares of the South, Inc.,* 584 So.2d at 831–32 (enforcing a state wide restriction on former bank executives); *Booth,* 533 So.2d at 211 (enforcing a sixty mile restriction that covered any employment with another television station within the entire broadcast area of the station that Booth worked for); *James S. Kemper & Co. Southeast, Inc.,* 434 So.2d at 1385 (enforcing a statewide restriction on an insurance salesman); *Parker v. EBSCO Industries, Inc.,* 282 Ala. 98, 209 So.2d 383 (1968) (indicating

that restrictions throughout the state and beyond the state borders have been upheld). The non-compete provision of the Purchase Agreement, to the extent set out in this opinion, is due to be enforced for a seventy-five mile radius around the facilities of Rehab Associates and its related companies that existed on September 28, 2001, the date of its acquisition by Benchmark.

The Plaintiff's post-trial brief and trial focus was upon the Purchase Agreement, rather than the Employment Agreement. The Employment Agreement restricts competition within the continental United States. Plaintiff's Exhibit 104 Employment Agreement at § 8.1. As previously stated, at trial and in its post-trial brief, the Plaintiff indicated that it no longer seeks nationwide application; instead, it requests an injunction of seventy-five miles around its existing facilities. Benchmark's representatives emphasize the regional influence of Barnes. Benchmark fails to show that Barnes' influence sweeps in the sort of nationwide scope in which its facilities can be found. As an employee, Benchmark utilized Barnes for expanding its business in the southeast, specifically Alabama, Georgia, and Chattanooga, Tennessee, not throughout its entire national network. *See, e.g.,* Plaintiff's Exhibit 129; Transcript 46:25 to 55:07. Although Barnes' influence may extend further in the Southeast, Benchmark has failed to present evidence that he solicited customers as an employee for them in other Southeastern states. Plaintiff's Exhibit 129.[22] In discussing the good will of

---

**22.** Plaintiff's counsel questioned Barnes as to whether he had been involved in trying to acquire clinics in Louisiana and Texas, while working for Benchmark. The uncontradicted testimony advanced in response to the Plaintiff counsel's question is that the attempted

acquisition of these clinics occurred before the acquisition by Benchmark.

Q. And during this period of time, you were involved in trying to acquire clinics in Louisiana and Texas.

Barnes and Rehab Associates, Benchmark states "[t]hat [their] local position, common celebrity and reputation has value beyond the immediate vicinities of the clinics; it extends throughout Alabama and Georgia." Plaintiff's post-trial brief at 10. Benchmark persuasively made the case at trial that Barnes' significant contacts and acquisition activities on Benchmark's behalf extended throughout Alabama and Georgia and into Chattanooga, Tennessee; however, Benchmark has not carried its burden with regard to facilities beyond these locations. Therefore, the court finds that it is appropriate to enforce the employment contract restriction within seventy-five miles of Benchmark's facilities in the states of Alabama and Georgia as of the date of Barnes termination by Benchmark.[23]

## C) Duration

 The restrictive covenant in the Purchase Agreement expires on September 28, 2006 (five years from the date of purchase). The covenant contained in the Employment Agreement terminates on October 2, 2005 (two years from the date of Barnes' termination). Barnes argues that these restrictions impose an undue hardship both upon himself and the public because he is unable to practice his profession of physical therapy. As the court has already concluded that the professional ex-

A. I'm confused about your time frame. You're talking about prior to Benchmark?
Q. When was the time that you tried to acquire clinics in Louisiana and Texas, then?
A. That was prior to Benchmark.
Transcript at p. 52:24 to 53:5.

23. The court is not aware of a facility managed or operated by Benchmark in Chattanooga, Tennessee; however, if such a facility existed on the date of Barnes' termination, then this court's order would be appropriately

clusion is applicable in this case, it is unnecessary to address this argument. Barnes contends that Benchmark failed to show that the five year restriction under the Purchase Agreement and the two year limitation under the Employment Agreement are reasonable. He suggests as an alternative that a one year period measured from the date of his termination would be a limitation with a reasonable duration.

Regarding how the five year restriction contained in the Purchase Agreement was determined, Binstein testified as follows:

Again, that, for us at Benchmark in doing all the deals we've done, my experience at Novacare in doing many, many, many deals, it's a fairly typical time period. Again, if you relate it specifically to this transaction, you know, in all deals you're paying a multiple of earnings, so you're paying up front a number of years' worth of the earnings that that business is proving that it enjoys and that that owner otherwise would have without the sale. So in order for us to recoup our investment given the multiple, five years, as well, seemed appropriate to protect our interest.

Transcript at p. 131:09 to 131:18.[24]

Benchmark paid six times the yearly earnings of Rehab Associates, a particularly

extended to include that facility as well for purposes of the restrictive covenant contained in the employment contract.

24. Barnes indicated that he negotiated with Benchmark regarding the duration limitation, trying to get them to change the time period from five to three years, but that he was unsuccessful in these efforts. Transcript at p. 82:07 to 84:05.

high multiple, in order to complete the purchase. *Id.* at 126:07 to 127:03. As an employee, Barnes, who had been the public face of Rehab Associates, was involved in the solicitation of customers and in seeking business opportunities for Benchmark, particularly as mentioned above in Alabama and Georgia. Barnes stands as a charismatic figure who attracts interest from others within the area of physical therapy who are interested in doing business with him.

Benchmark has demonstrated that the five year restraint contained in the Purchase Agreement is a restraint that is reasonably necessary to protect the buyer's interest, but which does not restrict the seller beyond what is reasonably necessary. *See, e.g., Files v. Schaible,* 445 So.2d 257 (Ala.1984) (enforcing a non compete agreement in a contract for the sale of a restaurant that included a five year restraint); *First Alabama Bancshares, Inc. v. McGahey,* 355 So.2d 681 (Ala.1977) (upholding a five year restriction in a covenant not compete related to the sale of a bank). Benchmark has also demonstrated that the two year restraint contained in the Employment Agreement is a restraint that is reasonably necessary to protect the employer's interest, but which does not restrict the employee beyond what is reasonably necessary. *Sheffield,* 553 So.2d at 126; *Robinson,* 346 So.2d at 943; *see also, e.g., Central Bancshares of the South, Inc.,* 584 So.2d at 831 (enforcing a two year restriction in the employment contract of bank executives); *James S. Kemper & Co. Southeast, Inc.,* 434 So.2d at 1384–85 (enforcing a two year restriction on an employee that was involved in soliciting customers for his employer).

## V. *CONCLUSION*

For reasons discussed above, Benchmark's request for a permanent injunction directing Barnes to comply with the terms of his restrictive covenants is due to be Granted in part and Denied in part, as set out herein.

A separate Judgment will be entered in accordance with these findings of fact and conclusions of law.

## ORDER AND JUDGMENT

Based on the Findings of Fact and Conclusions of Law entered by the court on this day, Judgment is entered in favor of the Plaintiffs Benchmark Medical Holdings, Inc., Benchmark Medical Management Company, and Benchmark Acquisition Corporation and against Defendant Glen "Rocky" Barnes. The court makes no findings of fact as to whether Barnes has in the past breached the purchase agreement or the employment agreement. The court orders that Glen "Rocky" Barnes is enjoined to comply with the restrictive covenants contained in the Purchase Agreement and his Employment. Agreement as described below:

1) Barnes may utilize his professional skills through being a hands-on physical therapist, a solo-practitioner, a teacher of physical therapy at an institution providing such instruction, and as a member or partner in a firm or association of physical therapists or a manager or executive in a physical therapy facility or among a group of physical therapists where he does hands-on physical therapy, assuming that providing direct oversight or supervision of the actual exercise and practice of hands-on physical therapy within the facility is a significant component of his position. Within these practices, Barnes permissibly can solicit patients through such activities as calling on doctors, hospitals, or other medical providers who are or may be a

source for patients for his rendition of those physical therapy services. Barnes may also engage in other attendant or concomitant activities associated with the practice of physical therapy in one of the above mentioned forms. For example, he can contact physicians to obtain referrals or to discuss a patient's progress, send out a brochure or solicitation letter seeking referrals, place a listing in the Yellow Pages, hire another physical therapist to work with him, supervise physical therapy assistants, write payroll checks, handle personnel matters, and exercise managerial responsibilities. Barnes may not engage in the practice of expanding the business of a physical therapy corporation or association by making contracts and connections with other facilities to take over the management of other physical therapy facilities or to acquire such facilities. Barnes may not participate in or assist others in a corporation or association in such activities. As for being a consultant to physical therapy facilities or practitioners, insofar as his consulting focuses upon providing physical therapy service or advice, rather than physical therapy business development or advice, or obtaining physical therapy clients, contacts, or business, Barnes may engage in such activity, provided, however, that if consultation is with a competing facility or practitioner covered by the agreements, he may not allow his name to be used by the competitor. He may not engage in consulting for physical therapy providers that is focused upon physical therapy business development or obtaining clients, contracts, or business. Barnes may acquire an interest in a physical therapy practice so long as the aforementioned conditions are met; however, Barnes may not acquire for investment purposes an interest in physical therapy practices over which he does not exercise

substantial personal and direct management and supervision over the direct hands-on delivery of the physical therapy services, except to the extent that passive investment in public companies is authorized by the agreements. Barnes is bound by the restrictions contained in the noncompete agreements prohibiting him from soliciting or hiring employees or officers of Rehab Associates or its related companies to the extent contained in the agreements. Barnes may act in accordance with the aforementioned conditions, and no further, within the geographic boundaries and for the durations set out hereafter.

2) Under the restrictive covenant contained in the Purchase Agreement, Barnes must comply with the aforementioned conditions within seventy-five miles of any facilities that were operated or managed by Rehab Associates, LLC or its affiliates Rehab Xcel, LLC, Rehab Colorado, LLC and Rehab Missouri, LLC on September 28, 2001, the date of their acquisition by Benchmark Medical Holdings, Inc., Benchmark Medical Management Company, and Benchmark Acquisition Corporation. Barnes must comply with these conditions until September 28, 2006, five years from the date of acquisition.

3) Under the restrictive covenant contained in the Employment Agreement, Barnes must comply with the aforementioned conditions within seventy-five miles of any facility in the States of Alabama and Georgia operated or managed by Benchmark Medical Holdings, Inc., Benchmark Medical Management Company, and Benchmark Acquisition Corporation on October 2, 2003. Barnes must comply with these conditions until October 2, 2005, two years from the date of his termination by Benchmark. If Benchmark Medical Holdings, Inc., Benchmark Medical Manage-

ment Company, and Benchmark Acquisition Corporation operated or managed a facility in Chattanooga, Tennessee on October 2, 2003, then the aforementioned restrictions are also applicable within a seventy-five mile radius of such facility.

4) Outside of the aforementioned geographic areas, the restrictive covenants contained in the Purchase Agreement and Barnes' Employment Contract are inapplicable.

5) Costs are taxed against the Defendant.