# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| HIGHTOWER HOLDING, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 2022-0086-LWW |
| | ) | |
| JOHN GIBSON, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

Date Submitted: November 9, 2022
Date Decided: February 9, 2023

Daniel C. Herr, LAW OFFICE OF DANIEL C. HERR LLC, Wilmington, Delaware; Matthew D. Henneman & Scott D. Smith, HENNEMAN RAU KIRKLIN & SMITH LLP, Houston, Texas; *Attorneys for Plaintiff HighTower Holding, LLC*

John H. Newcomer, Jr., MORRIS JAMES LLP, Wilmington, Delaware; Andrew P. Campbell, Todd Campbell & Erin G. Godwin, CAMPBELL PARTNERS, LLC, Birmingham, Alabama; *Attorneys for Defendant John Gibson*

**WILL, Vice Chancellor**

This decision considers plaintiff HighTower Holding, LLC's request for a preliminary injunction enjoining defendant John Gibson from breaching covenants not to compete. Gibson agreed to these covenants when HighTower purchased an investment advisory business in which Gibson was a partner. If enforced, the covenants would arguably bar Gibson from managing a hedge fund he launched after separating from HighTower.

I conclude that HighTower has not carried its burden of demonstrating that it is likely to succeed after trial on its claims that Gibson breached the non-compete provisions. Despite the parties' choice of Delaware law to govern their contracts, Alabama law—which has a substantially stronger relationship to this dispute than Delaware—applies. Alabama maintains a legislatively expressed public policy against broad non-compete provisions (particularly concerning professionals) that outweighs Delaware's interest in enforcing contracts. HighTower's motion for a preliminary injunction is therefore denied.

I. FACTUAL BACKGROUND

The background is drawn from the plaintiff's Verified Original Complaint (the "Complaint"), the record developed in connection with the plaintiff's motion

for a preliminary injunction, and documents subject to judicial notice. Based on the current record, the following facts are those that I would likely find after trial.[1]

## A. The Protective Agreement and the LLC Agreement

Defendant John Gibson is a licensed financial advisor residing in Alabama.[2] In 2012, Gibson was hired as a Financial Analyst at Twickenham Wealth Advisors, a financial advisory firm in Huntsville, Alabama.[3]

Around September 2013, Twickenham became an affiliate firm of plaintiff HighTower Holding, LLC, which provides financial advisory services through subsidiaries across the United States.[4] In January 2019, Gibson and his Twickenham

---

[1] *See In re Dollar Thrifty S'holder Litig.*, 14 A.3d 573, 578 (Del. Ch. 2010); *Braunschweiger v. Am. Home Shield Corp.*, 1991 WL 3920, at *1 (Del. Ch. Jan. 7, 1991) ("Because of the tentative nature of factual conclusions reached in a preliminary injunction proceeding, it is open to the court to further consider factual matters thereafter." (citing *Univ. of Texas v. Camenisch*, 451 U.S. 390, 399 (1981))); *In re Books-A-Million, Inc. S'holders Litig.*, 2016 WL 5874974, at *1 (Del. Ch. Oct. 10, 2016) (explaining that the court may take judicial notice of "facts that are not subject to reasonable dispute" (citing *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 170 (Del. 2006))).

Citations in the form of "Pl.'s Opening Br. Ex. __" refer to exhibits to the Plaintiff's Opening Brief in Support of its Motion for Preliminary Injunction. Dkt. 28. Citations in the form of "Def.'s Answering Br. Ex. __" refer to exhibits to the Transmittal Affidavit of John H. Newcomer, Jr., Esquire in Support of Defendant's Answering Brief in Opposition to Plaintiff's Motion for Preliminary Injunction. Dkt. 30.

[2] *See* Verified Original Compl. (Dkt. 1) ("Compl.") ¶ 7; Def.'s Answering Br. Ex. 1 ("Gibson Dep.") 13, 16; Pl.'s Opening Br. Ex. 16 ("Gibson Registration History"); BrightHaven, https://www.brighthavencapital.com/about (last visited Feb. 8, 2023).

[3] Compl. ¶ 10; *see* Def.'s Answering Br. Ex. 11 ("Berg Dep.") 97.

[4] Compl. ¶ 11; *see* Hightower Advisors, https://hightoweradvisors.com (last visited Feb. 8, 2023).

2

partners—Henry "Moss" Crosby, Jr., Rob Warren, Jamie Day, Wes Clayton, and Michael Ahearn (collectively, with Gibson, the "Partners")—sold a majority interest in Twickenham to HighTower.[5]

The sale was made pursuant to a Unit Purchase Agreement and other ancillary agreements.[6] Gibson received more than $600,000 in cash and more than 100,000 HT Holding, LLC units valued at $1.80 per unit.[7]

In connection with the transaction, each Partner signed a Standard Protective Agreement (the "Protective Agreement") containing restrictive covenants.[8] Section 5 of the Protective Agreement provides:

> During the Restricted Period [ending February 1, 2024], Principal [Gibson] shall not, directly or indirectly . . . (i) own any interest in, manage, control, participate in, consult with or be or become engaged or involved in any Person engaged in or to engage in the Business within the United States or any other jurisdiction in which HighTower or the Partner Firm [HTT Newco] does business (the "Territory") . . . or (ii) make any investment (whether equity, debt or other) in, lend or otherwise provide any money or assets to, or provide any guaranty

---

[5] Compl. ¶ 12 & n.5; *id.* ¶ 11. Crosby was a Managing Partner of Twickenham and co-founded the company with Clayton. *Id.* ¶ 19 n.12.

[6] *Id.* ¶ 12; Pl.'s Opening Br. Ex. 3 ("Unit Purchase Agreement"); *see* Pl.'s Opening Br. Ex. 1 ("Protective Agreement"); Pl.'s Opening Br. Ex. 2 ("LLC Agreement"); Pl.'s Opening Br. Ex. 4 ("Partnership Services and Affiliation Agreement"); Pl.'s Opening Br. Ex. 5 ("Contribution and Exchange Agreement (Personal Goodwill)").

[7] Compl. ¶ 14; Unit Purchase Agreement § 1(a), Sched. A; *see* Gibson Dep. 158-59.

[8] Compl. ¶¶ 13, 15-16.

> or other financial assistance to any Person engaged in or to engage in the Business in the Territory . . . .[9]

The Partners, HighTower, and HT Holding also became members in a new HighTower entity—HTT Newco, LLC.[10] HighTower became the majority member of HTT Newco, and the Partners were designated as principals.[11] HTT Newco was formed to provide certain services—pursuant to a Partnership Services and Affiliation Agreement—to facilitate HighTower's operation of the Twickenham business.[12]

---

[9] Protective Agreement § 5.

"Business" means "(i) the business of acquiring and/or recruiting investment advisor firms and/or investment advisors or broker personnel; (ii) the business of providing services or products relating to investment management or advice and product or services ancillary thereto; or (iii) any other business that HighTower conducts or operates or takes material steps toward conducting or operating at any time during the term of the Partner Arrangements." *Id.* § 11(a).

"Restricted Period" means the "period ending on the date that is the later of (i) 24 months immediately following the voluntary or involuntary termination of the Partnership Arrangements for any reason and (ii) 60 months following the date of the last payment to or on behalf of Principal under the [Unit Purchase] Agreement." *Id.* § 4. The last Unit Purchase Agreement payment was made to Gibson on February 1, 2019. Compl. ¶ 15 n.7. Therefore, the restrictions in the Protective Agreement extend to February 1, 2024.

[10] *Id.* ¶ 12.

[11] LLC Agreement Sched. A, Art. I. A majority of the principals had the authority to manage the company subject to certain negative and affirmative covenants based on HighTower's prior written consent. *Id.* § 5.1.

[12] Partnership Services and Affiliation Agreement § 3(d). A subsidiary operating company of HighTower held the employees and assets HighTower purchased from Twickenham. *Id.* at Preamble. HTT Newco provided certain services to this operating company and other affiliates of HighTower. *Id.* Each Partner also transferred to HTT Newco his goodwill in the Twickenham business—"all of his personal and ongoing business relationships with clients and key businesses, as well as [his] experience and reputation . . . that comes from

4

The members of HTT Newco, including Gibson, executed a February 1, 2019 Amended and Restated Limited Liability Company Agreement (the "LLC Agreement") that also contained restrictive covenants.[13] Section 6.7(c) of the LLC Agreement provides:

> During the Restricted Period [ending July 7, 2025], no Restricted Member [Gibson] shall, directly or indirectly, on such Restricted Member's own behalf or on behalf of any other Person . . . (i) own any interest in, manage, control, participate in, consult with or be or become engaged or involved in any Person engaged in or to engage in the Business within the United States or any other jurisdiction in which any Restrictive Covenant Beneficiary [HighTower or HTT Newco] does business (the "Territory") . . . or (ii) make any investment (whether equity, debt or other) in, lend or otherwise provide any money or assets to, or provide any guaranty or other financial assistance to any Person engaged in or to engage in the Business in the Territory . . . .[14]

---

the personal, direct and intimate involvement . . . in interacting with clients and other key business relations." Contribution and Exchange Agreement (Personal Goodwill) § 1.

[13] Compl. ¶¶ 12, 18.

[14] LLC Agreement § 6.7(c).

"Business" means "(i) so long as the Partner Agreements are in effect, the business of the Company [i.e., HTT Newco] and any Permitted Partner Assignee as contemplated by the Partnership Services and Affiliation Agreement, and (ii) thereafter, the business of the Company and any Permitted Partner Assignee providing wealth management, investment advisory and brokerage services or products relating and ancillary thereto." *Id.* Art. I.

"Restricted Period" means "(i) a period of forty-eight (48) months immediately following the date that such Restricted Member . . . no longer holds any direct or indirect interest in the Units as a result of a repurchase of such Units upon a Cause Event pursuant to the terms of Section 9.4 hereto, or (ii) a period of twenty-four (24) months immediately following the date that such Restricted Member . . . no longer holds any direct or indirect interest in the Units for any other reason." *Id.* § 6.7(b). As of July 7, 2021, the terms of

### B. Gibson's Resignation

On November 30, 2020, Gibson told Crosby of his desire to start a hedge fund.[15] Crosby was concerned about the potential implications for HighTower and asked Gibson to raise the idea with all of the Partners.[16]

Gibson met with the Partners on December 9.[17] He expressed his intention to start an "Opportunistic Hedge Fund" that would allow him to deliver favorable returns to HighTower clients.[18] Gibson hoped to run the fund as a separate entity within HighTower.[19] But he indicated that if he were unable to do so, he would leave HighTower to launch the fund on his own.[20]

The Partners warned Gibson that opening a hedge fund apart from HighTower could violate the restrictive covenants in the Protective Agreement and the LLC Agreement.[21] Gibson said that he would wait to launch the fund until the agreements

---

subsection (i) of the "Business" definition were met. Compl. ¶ 18 & n.11; *see infra* note 28 and accompanying text (describing Gibson's resignation and the repurchase of his interests in HTT Newco). The restrictions in the LLC Agreement therefore extend to July 7, 2025.

[15] Compl. ¶ 19.

[16] *Id.* ¶ 20.

[17] *Id.* ¶ 22.

[18] *Id.*

[19] *Id.*; *see* Def.'s Answering Br. Ex. 9 at 1 (describing the structure of the proposed venture).

[20] Compl. ¶ 22.

[21] *Id.*

expired.[22]  On December 11, HighTower's Executive Director of Compliance called Crosby to report that Gibson had asked for guidance on avoiding the restrictive covenants with HighTower.[23]

On December 14, the Partners confronted Gibson about his planned course of action and asked him to reconsider.[24]  The Partners suggested that they reconvene a few days later, but Gibson turned over his office keys and laptop.[25]  On December 16, Gibson tendered a resignation letter and told the Partners that he intended to adhere to the restrictive covenants.[26]  Two days after Gibson's resignation, HighTower sent Gibson a letter reminding him of his post-employment obligations under the Protective Agreement and the LLC Agreement.[27]

In June 2021, the Partners and Gibson reached an agreement for the repurchase of Gibson's equity interests in HTT Newco.[28]

---

[22] *Id.*

[23] *Id.* ¶ 23.

[24] *Id.* ¶ 25.

[25] *Id.*

[26] *Id.* ¶ 26.

[27] Pl.'s Opening Br. Ex. 10.

[28] Compl. ¶ 30.  In furtherance of the Twickenham sale, Gibson and the other Partners contributed their HTT Newco units to HTT Holdco, LLC.  *Id.* ¶ 18 n.10.  At the time of his resignation from HighTower, Gibson did not own any interest in HTT Newco except through his interest in HTT Holdco.  *Id.*

## C. BrightHaven's Formation

In March 2020, Gibson formed BrightHaven Capital, LLC under Alabama law and the fund BrightHaven Alpha, LP under Delaware law.[29] In November, Gibson formed BrightHaven Capital Management, LLC as an Alabama entity.[30]

On July 26, 2021, Gibson registered BrightHaven Capital Management as an investment advisor firm with the Securities and Exchange Committee.[31] Gibson registered as an investment advisor representative with BrightHaven Capital Management the next day.[32]

On September 8, 2021, BrightHaven Alpha filed a Notice of Exempt Offering of Securities that listed BrightHaven Capital as its General Partner, BrightHaven Capital Management as its Investment Manager, and Gibson as the Manager of

---

[29] Pl.'s Opening Br. Ex. 11 ("BrightHaven Capital Certificate of Formation"); Pl.'s Opening Br. Ex. 12 ("BrightHaven Alpha Entity Details").

[30] Pl.'s Opening Br. Ex. 13 ("BrightHaven Capital Management Certificate of Formation").

[31] Compl. ¶ 31; Pl.'s Opening Br. Ex. 15 ("BrightHaven Capital Management SEC Registration").

[32] Compl. ¶ 31; *see* Gibson Registration History.

BrightHaven Capital Management.[33]  BrightHaven Alpha also listed an Alabama address as its "Principal Place of Business and Contact Information."[34]

### D.  HighTower Loses Clients.

While at HighTower, Gibson managed relationships with about 40 clients.[35] He was also responsible for leading Portfolio Allocation and Management for HighTower's entire client base, comprised of nearly $1.5 billion in assets under management.[36]  HighTower alleges that since Gibson's resignation, accounts totaling $3.3 million in assets under management have terminated their relationships with HighTower.[37]

### E.  This Litigation

On January 26, 2022, HighTower filed its Complaint against Gibson.  The Complaint advances seven claims.  Only two claims—that Gibson breached the

---

[33] Pl.'s Opening Br. Ex. 17 ("BrightHaven Alpha SEC Registration").

On January 7, 2022, Gibson's father, Phillip Gibson, formed BrightHaven Financial Advisors, LLC under Alabama law and serves as its Chief Executive Officer and Chief Compliance Officer.  Pl.'s Opening Br. Ex. 19; Pl.'s Opening Br. Ex. 20.  HighTower argues that Philip Gibson has acted in concert with John Gibson to compete with its business.  Pl.'s Opening Br. in Supp. of Its Mot. for Prelim. Inj. (Dkt. 28) ("Pl.'s Opening Br.") 48-54.  These allegations do not appear in the Complaint.

[34] *See* BrightHaven Alpha SEC Registration.  This same address was listed as the "Registered Office Street Address" and "Registered Office Mailing Address" for BrightHaven Capital and BrightHaven Capital Management.  *See* BrightHaven Capital Certificate of Formation; BrightHaven Alpha Entity Details.

[35] Compl. ¶¶ 10, 33.

[36] *Id.*

[37] *Id.* ¶¶ 27-29, 33.

9

Protective Agreement (Count I) and the LLC Agreement (Count II)—are relevant to this decision.[38]

Along with the Complaint, HighTower filed a motion for expedited proceedings and a motion for a preliminary injunction.[39] On June 24, I granted the motion to expedite and permitted the parties to undertake limited discovery before a preliminary injunction hearing.[40] I heard oral argument on HighTower's motion for a preliminary injunction on November 9.[41]

## II. LEGAL ANALYSIS

"A preliminary injunction may be granted where the movant[] demonstrate[s]: (1) a reasonable probability of success on the merits at a final hearing; (2) an imminent threat of irreparable injury; and (3) a balance of the equities that tips in favor of issuance of the requested relief."[42] The three elements are not necessarily

---

[38] *Id.* ¶¶ 37-44. HighTower also alleges that Gibson engaged in unfair competition (Count III), breached his duty of loyalty to HighTower (Count IV), tortiously interfered with HighTower's business relationships (Count V), and unjustly enriched himself (Count VI). *Id.* ¶¶ 45-56. HighTower's Complaint includes a claim "for preliminary injunction" (Count VII). *Id.* ¶¶ 57-63.

[39] Dkt. 1.

[40] Dkt. 17.

[41] Dkts. 35, 36.

[42] *Cabela's LLC v. Wellman*, 2018 WL 5309954, at *3 (Del. Ch. Oct. 26, 2018) (quoting *Nutzz.com, LLC v. Vertrue Inc.*, 2005 WL 1653974, at *6 (Del. Ch. July 6, 2005)).

given equal weight. "A strong showing on one element may overcome a weak showing on another element."[43]

HighTower's motion for a preliminary injunction focuses on whether it has a reasonable probability of succeeding on its claims that Gibson breached the non-compete provisions in the Protective Agreement and the LLC Agreement.[44] HighTower does not need to prove that it will prevail on those claims at trial. Rather, it need only "show that there is a reasonable probability that it would prevail at a final hearing on the merits of one or more of these claims."[45]

For the reasons discussed below, HighTower has not established a reasonable probability of success on the merits of these breach of contract claims. Alabama law, rather than Delaware law, applies. The non-compete provisions are likely void under Alabama law. And Alabama's strong interests against enforcing the covenants outweigh Delaware's contractarian policies.

---

[43] *Cantor Fitzgerald, L.P. v. Cantor*, 724 A.2d 571, 579 (Del. Ch. 1998).

[44] Pl.'s Opening Br. 38-47. The Protective Agreement and the LLC Agreement also contain a non-solicitation covenant and confidentiality obligations. HighTower only addressed its claims for breach of the non-competition covenants in its preliminary injunction briefing. *See Emerald P'rs v. Berlin*, 726 A.2d 1215, 1224 (Del. 1999) ("Issues not briefed are deemed waived.").

[45] *ZRii, LLC v. Wellness Acq. Grp., Inc.*, 2009 WL 2998169, at *8 (Del. Ch. Sept. 21, 2009).

### A.    Alabama is the Default State.

Both the Protective Agreement and the LLC Agreement contain Delaware choice of law provisions.[46] Delaware follows the Restatement (Second) of Conflicts of Laws, which provides that a contractual choice of law will generally control.[47] An exception to the Restatement recognizes, however, that the law of the default state—i.e., that which would apply absent a choice of law provision—will govern in certain circumstances.  The law of the default state will apply if "enforcement of the covenant would conflict with a 'fundamental policy'" of the default state's law, and the default state "has a materially greater interest in the issues—enforcement (or not) of the contract at hand—than Delaware."[48]

Alabama, having "the most significant relationship to the transaction and the parties," is the default state.[49]  The Protective Agreement and the LLC Agreement

---

[46] Protective Agreement § 12(e); LLC Agreement § 14.9.

[47] *Ascension Ins. Hldgs., LLC v. Underwood*, 2015 WL 356002, at *2 (Del. Ch. Jan. 28, 2015).

[48] *FP UC Hldgs., LLC v. Hamilton*, 2020 WL 1492783, at *8 (Del. Ch. Mar. 27, 2020) (first quoting *Ascension*, 2015 WL 356002, at *6-8; and then citing Restatement (Second) Conflict of Laws ("Restatement") §§ 187-88 (1971)).

[49] Restatement § 188(1).  Section 188(2) of the Restatement provides that the  "contacts to be taken into account" in determining the state with the "most significant relationship" include: "(a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicil, residence, nationality, place of incorporation and place of business of the parties." *Id.* § 188(2); *see also FP UC*, 2020 WL 1492783, at *9 (describing overarching principles that the court may consider in conducting the "most significant relationship" analysis (citing Restatement § 6)).

12

were negotiated and executed in Alabama.[50] The Twickenham business acquired by HighTower was located in Alabama.[51] The relevant agreements were performed in Alabama.[52] The alleged infringement also centers on Alabama given that the BrightHaven entities (except BrightHaven Alpha) are formed under Alabama law.[53] BrightHaven Capital Management is also registered as an investment advisor firm in Alabama, and Gibson is registered as an investment advisor representative in Alabama.[54] Finally, Gibson has resided in Alabama at all relevant times.[55]

---

[50] *See* Def.'s Answering Br. in Opp'n to Pl.'s Mot. for Prelim. Inj. (Dkt. 30) ("Def.'s Answering Br.") 18. Because HighTower has not refuted this assertion, I assume its truth for purposes of my analysis.

[51] *See* Berg Dep. 97.

[52] Restatement § 188 cmt. e (explaining that "the state where performance is to occur has an obvious interest in the question whether this performance would be illegal"); *accord FP UC*, 2020 WL 1492783, at *9.

[53] *See* BrightHaven Capital Certificate of Formation; BrightHaven Capital Management Certificate of Formation; BrightHaven Alpha Entity Details; *supra* note 33 (describing BrightHaven Financial Advisors).

[54] *See* BrightHaven Capital Management SEC Registration.

[55] *See* Compl. ¶¶ 7; Gibson Dep. 13. Gibson's "Alabama domicile at the time of contracting further supports an inference that the parties anticipated his performance (i.e., non-competition) might well occur in that state—meaning his performance was not divided 'equally' among multiple states." *FP UC*, 2020 WL 1492783, at *9 (quoting Restatement § 188 cmt. e); *cf.* Restatement § 188 cmt. e ("[T]he place of performance can bear little weight in the choice of the applicable law when . . . performance by a party is to be divided more or less equally among two or more states.").

Delaware's ties are limited by comparison. HighTower, HTT Newco, and BrightHaven Alpha are Delaware entities.[56] And the relevant agreements contain Delaware choice of law provisions.[57]

The heavy weight of Alabama's relationship to this matter indicates that its law would apply absent the parties' selection of Delaware law. I therefore go on to consider "whether the enforcement of the covenant[s] would conflict with a

---

[56] *See* Compl. ¶ 6; LLC Agreement § 2.1; BrightHaven Alpha Entity Details.

[57] HighTower cites several cases for the proposition that a Delaware court will enforce a Delaware choice of law provision so long as there is a "material relationship" to Delaware. Pl.'s Reply Br. in Supp. of Its Mot. for Prelim. Inj. (Dkt. 32) ("Pl.'s Reply Br.") 12-13. According to HighTower, the Delaware choice of law provision and the presence of Delaware entities constitute "material relationships." *Id.* (citing *Johnson v. Student Funding Grp., LLC*, 2015 WL 351979, at *2 (Del. Super. Ct. Jan. 26, 2015); *Greetham v. Sogima L-A Manager, LLC*, 2008 WL 4767722, at *14 (Del. Ch. Nov. 3, 2008); *OmniMax Int'l v. Dowd*, 2019 WL 3545848, at *2 (Del. Super. Ct. July 17, 2019); *Abry P'rs V, L.P. v. F & W Acq. LLC*, 891 A.2d 1032, 1047 (Del. Ch. 2006)). These cases are distinguishable from the present matter.

First, *Johnson* involved a choice of forum provision rather than one concerning the choice of substantive law. 2015 WL 351979, at *2. Similarly, neither *Greetham* nor *Abry* involved restrictive covenants. In *Greentham*, the plaintiff sought to enforce a draft servicing agreement as a contract or, alternatively, sought damages under a promissory estoppel theory. 2008 WL 4767722, at *13. In *Abry*, the plaintiff sought rescission of a stock purchase agreement—or, alternatively, damages—for fraudulent inducement. 891 A.2d at 1041. Finally, *OmniMax* held that Delaware law applied because "no other state has a greater material relationship. The Plaintiff [wa]s headquartered in Georgia, the Defendant reside[d] in Texas, and the Plaintiff's work territory encompassed all of North America." 2019 WL 3545848, at *2. Here, Alabama is the default state since it has the most significant relationship to the litigation.

14

'fundamental policy'" of Alabama.[58]  If so, I must then assess whether Alabama "has a materially greater interest in the issues . . . than Delaware."[59]

## B. The Restrictive Covenants Conflict With Alabama Policy.

"Alabama's policy against covenants not to compete is a fundamental public policy."[60]  "[I]t is well-settled [that] Alabama law 'frowns on restrictive covenants.'"[61]  The legislature codified this policy in the Code of Alabama, which provides that "every contract by which anyone is restrained from exercising a lawful profession" is void, unless one of a few outlined exceptions apply.[62]  One relevant exception provides that:

> the following contract [is] allowed to preserve a protectable interest . . . One who sells the good will of a business may agree with the buyer to refrain from carrying on or engaging in a similar business and from soliciting customers of such business within a specified geographic

---

[58] *FP UC*, 2020 WL 1492783, at *8 (quoting *Ascension*, 2015 WL 356002, at *6-8).

[59] *Id.*

[60] *Cherry, Bekaert & Holland v. Brown*, 582 So. 2d 502, 507-08 (Ala. 1991) (holding that "the contractual choice of North Carolina law c[ould not] be given effect and that Alabama law will govern th[e] agreement").

[61] *FP UC*, 2020 WL 1492783, at *10 (quoting *McGriff Seibels & Williams, Inc. v. Sparks*, 2019 WL 4600051, at *13 (N.D. Ala. Sept. 23, 2019)).

[62] Ala. Code § 8-1-190(a).  Effective January 1, 2016, Section 8-1-190 superseded the previous version of the statute, which had been codified at Section 8-1-1.  The amendment, however, "preserves the current presumption previously found in Section 8-1-1 of the Code of Alabama, 1975 against contracts in restraint of trade."  *Id.* Ala. Cmt.; *see also id.* § 8-1-197 Ala. Cmt. ("This section is intended to codify current Alabama case law.").  Thus, "case law decided prior to January 1, 2016, is still good law for guidance on issues arising under the new statute."  *DJR Assocs., LLC v. Hammonds*, 241 F. Supp. 3d 1208, 1225 (N.D. Ala. 2017).

15

area so long as the buyer, or any entity deriving title to the good will from that business, carries on a like business therein, subject to reasonable time and place restraints. Restraints of one year or less are presumed to be reasonable.[63]

As part of the Twickenham sale, Gibson executed a Contribution and Exchange Agreement (Personal Goodwill),[64] through which he assigned to HTT

---

[63] Ala. Code § 8-1-190(b)(3).

Section 8-1-190(b)(4) provides:

> An agent, servant, or employee of a commercial entity may agree with such entity to refrain from carrying on or engaging in a similar business within a specified geographic area so long as the commercial entity carries on a like business therein, subject to reasonable restraints of time and place. Restraints of two years or less are presumed to be reasonable.

That statute likely does not apply here because Gibson resigned from his position as an employee of HighTower as part of the Twickenham sale. *See* Partnership Services and Affiliation Agreement § 1 ("Prior to the Effective Date, each of the Principals [Gibson and the Partners] has resigned from his or her position as an employee of any HighTower Party to which he or she was employed."). Instead, Gibson was a member and principal of HTT Newco, which provided services to HighTower as an independent contractor. *Id.* § 11 (providing that HTT Newco, Gibson, and the Partners were independent entities from HighTower); *see supra* notes 11-12 and accompanying text (describing HTT Newco's role); Berg Dep. 21 ("[T]he principals of Hightower Twickenham are not direct employees of [HighTower]."). Thus, Gibson was not "[a]n agent, servant, or employee of" HighTower at the time of execution of the Protective Agreement or the LLC Agreement. Ala. Code § 8-1-190(b)(4); *see Clark Substations, L.L.C. v. Ware*, 838 So. 2d 360, 363 (Ala. 2002) ("The employee-employer exception to the voidness of noncompete agreements does not save a noncompete agreement unless the employee-employer relationship exists at the time the agreement is executed."). At oral argument, HighTower acknowledged that "[t]his is not an employee agreement situation" but rather a "sale of business scenario." Oral Arg. Tr. (Dkt. 36) 18, 11-12.

[64] Unit Purchase Agreement § 1(a)(iv), Sched. B (providing that "[a]t the Closing," the parties were to "execute and deliver" the Protective Agreement and the Contribution and Exchange Agreement (Personal Goodwill)).

16

Newco "all of his personal and ongoing business relationships with clients and key businesses, as well as [his] experience and reputation . . . that comes from the personal, direct and intimate involvement . . . in interacting with clients and other key business relations."[65] These assigned interests seemingly fall within the meaning of "good will of a business" under the Alabama statute.[66] But additional considerations lead me to conclude that the restrictive covenants at issue likely run afoul of Alabama law and public policy.

####     1.    Professional Exemption

First, the statutory exception for the sale of a business "do[es] not apply to professionals."[67] This exemption—to the exception—flows from Alabama's

---

[65] Contribution and Exchange Agreement (Personal Goodwill) § 1.

[66] *See First Alabama Bancshares, Inc. v. McGahey*, 355 So. 2d 681, 683 (Ala. 1977) (holding that an acquisition of a bank included the sale of good will because "[t]he utmost trust and personal faith is required of a banker by his customers"); *Cent. Bank of the S. v. Beasley*, 439 So. 2d 70, 72-73 (Ala. 1983) (same); *Kershaw v. Knox Kershaw, Inc.*, 523 So. 2d 351, 358 (Ala. 1988) ("Where one sells his stock he necessarily disposes of his interest in the good will of the business conducted by the corporation to the same extent as he parts with his interest in any other property of the corporation. . . . [Even though] 'good will' was not specified as an asset in the sale, it was 'incident to and inherent in] the business itself, and was, therefore, included in the exchange of stock." (citations omitted)).

[67] *FP UC*, 2020 WL 1492783, at *10 (quoting *Benchmark Med. Hldgs., Inc. v. Barnes*, 328 F. Supp. 2d 1236, 1243 (M.D. Ala. 2004)); *Benchmark*, 328 F. Supp. 2d at 1243 ("[T]he statutory exceptions allowing non-compete agreements in the sale of good will of a business and in employment contracts do not apply to professionals."); *Friddle v. Raymond*, 575 So. 2d 1038, 1040 (Ala. 1991) ("Although the remaining subsections of § 8-1-1 provide for exceptions to the general rule, including an exception for the sale of the good will of a business, this Court has stated on numerous occasions that a 'professional' cannot fall within these statutory exceptions.").

interest in its citizens "being able to receive [professional] services."[68] Alabama courts have recognized "professional" exemptions for: accountants;[69] physicians specializing in otolaryngology (ear, nose, and throat);[70] ophthalmologists;[71] physical therapists;[72] and veterinarians.[73]   By contrast, optometrists,[74] orthotists and prosthetists,[75] tax preparation specialists,[76] and exterminators[77] are not considered "professionals."

---

[68] *Benchmark*, 328 F. Supp. 2d at 1253.  The statutory basis for this exemption comes from the fact that "profession" is included in Section 8-1-190(a)'s general prohibition against restrictive covenants but excluded from Section 8-1-190(b)'s exceptions.  *See Thompson v. Wiik, Reimer & Sweet*, 391 So. 2d 1016, 1019 (Ala. 1980) ("Having included 'profession' in [Section 8-1-190(a)], and omitted this term in [Section 8-1-190(b)], an affirmative inference is created that the legislature did not intend to include professions in [Section 8-1-190(b)], such interpretation being aided by resort to the maxim 'expressio unius est exclusio alterius.'" (quoting *Odess v. Taylor*, 211 So.2d 805, 811 (Ala. 1968))).

[69] *Gant v. Warr*, 240 So. 2d 353, 355-56 (Ala. 1970) (holding that the practice of accounting by a certified public accountant is a "profession"); *Burkett v. Adams*, 361 So. 2d 1, 3 (Ala. 1978) (applying *Grant* in concluding that "public accountants" are "professionals"); *Cherry*, 582 So. 2d at 505 (same).

[70] *Oddess*, 211 So. 2d at 811-12.

[71] *See Salisbury v. Semple*, 565 So. 2d 234, 236 (Ala. 1990).

[72] *Benchmark*, 328 F. Supp. 2d at 1250-56.

[73] *Friddle*, 575 So. 2d at 1039-40.

[74] *See Ala. Bd. of Optometry v. Eagerton*, 393 So. 2d 1373, 1378 (Ala. 1981) (analyzing whether optometry was a "learned profession" for tax purposes).

[75] *J.E. Hanger, Inc. v. Scussel*, 937 F. Supp. 1546, 1557 (N.D. Ala. 1996).

[76] *See H&R Block E. Enters., Inc. v. Lewis, et al.*, C.A. No. 1:05cv0801-RBP, slip op. at 21 (N.D. Ala. Jan. 27, 2006).

[77] *Dobbins v. Getz Exterminators of Ala., Inc.*, 382 So. 2d 1135, 1137 (Ala. Civ. App. 1980).

Alabama courts have not opined on whether an investment advisor like Gibson is a "professional" for purposes of the exemption.[78] One Alabama court enforced a non-compete against a banker without considering the banker's professional status.[79] Another observed, in dicta, that "the licensing of securities brokers does not, in and of itself, compel the conclusion that securities brokers are engaged in a profession."[80]

After reviewing the relevant Alabama case law, however, I believe there is a meaningful risk that Alabama policy would be offended if the non-competes were enforced against Gibson. Alabama courts look to several factors in assessing whether a line of work constitutes a profession: "(1) professional training, skill, and experience required to perform certain services; (2) the delicate nature of the services offered; and (3) the ability and need to make instantaneous decisions."[81] These factors weigh in favor of viewing Gibson as a professional who is exempt from the sale of business exception.[82]

---

[78] *See G.L.S. & Assocs. v. Rogers*, 155 So. 3d 263, 269-70 (Ala. Civ. App. 2014) (declining to opine, at the motion to dismiss stage, on whether a FINRA-registered securities broker was a professional).

[79] *See First Alabama Bancshares*, 355 So. 2d at 684.

[80] *G.L.S.*, 155 So. 3d at 270.

[81] *J.E. Hanger*, 937 F. Supp. at 1557 (citing *Friddle*, 575 So. 2d at 1039).

[82] I am not holding, as a matter of law, that a hedge fund manager or investment advisor is necessarily a "professional" who is exempt from the exceptions in the Alabama Code.

Gibson is a registered investment advisor who spent years achieving the various licenses that allow him to serve clients.[83] Managing clients' finances can certainly be a delicate endeavor and investment decisions may require quick thinking. Beyond that, investment advisors like Gibson owe fiduciary duties to their clients.[84] Gibson's position seems considerably closer to an accountant (who is a "professional" under Alabama law) than a seasonal tax preparer (who is not).[85] Furthermore, "the public interest" in having Gibson's investment advising "services available to" the public would be impaired if Gibson were barred from continuing his work at BrightHaven.[86]

---

Rather, I conclude that HighTower has failed to demonstrate a reasonable probability of success on this issue and that public policy considerations appear to favor Gibson.

[83] *See* Gibson Registration History (noting that Gibson holds Series 7, Series 66, and SIE licenses and is a registered investment advisor representative); Gibson Dep. 16 (same); BrightHaven, https://www.brighthavencapital.com/about (last visited Feb. 8, 2023) (indicating Gibson is a "CFA Charterholder"); Ala. Code § 8-6-3(b) (requiring investment advisors transacting business in Alabama to register with the state).

[84] *See Benchmark*, 328 F. Supp. 2d at 1250-56 (explaining that an individual who provides "hands-on" services to the public, rather than overseeing others, was a professional against whom a noncomplete could not be enforced).

[85] *Compare H&R Block*, slip op. at 21-22 (N.D. Ala. Jan. 27, 2006) (stating that the "court c[ould not] conclude, as a matter of law, that [tax preparers] were professionals" but holding that the restrictive covenant should not apply because tax preparers held seasonal positions and "were unskilled and had only a limited relationship with the client/customers") *with Burkett*, 361 So. 2d at 3 (describing "public accountants" as professionals after discussing the field as a "common calling in the spirit of public service" that is "incidentally a means of livelihood" (citations omitted)).

[86] *Benchmark*, 328 F. Supp. 2d at 1255; *see infra* note 103 (noting that a preliminary injunction would harm Gibson's clients and investors).

## 2. Unreasonable Restraints

Even if Gibson were not considered a "professional" within the exemption, HighTower is not likely to succeed on the merits of its claims due to the overbreadth of the non-compete provisions. Alabama's public policy against broad restrictive covenants is evident from its legislation. Section 8-1-190(b)(3) of the Alabama Code states that non-compete provisions in the sale of the business context must be "subject to reasonable time and place restraints."[87] The relevant provisions likely run afoul of that requirement for several reasons.

First, the covenants are broad in duration and geography.

The restrictions in the Protective Agreement and the LLC Agreement both became effective on February 1, 2019 and expire on February 1, 2024 and July 7, 2025, respectively.[88] These five-year limitation periods well exceed the one-year period presumed to be reasonable under the Alabama Code.[89] The United States

---

[87] Ala. Code § 8-1-190(b)(3); *see also Picker Int'l, Inc. v. Parten*, 935 F.2d 257, 260 (11th Cir. 1991) ("Alabama courts will enforce a non-compete agreement if it (1) falls within a statutory exception to the general prohibition, and (2) is reasonably limited as to territory, duration and subject matter" (quoting *Nationwide Mut. Ins. Co. v. Cornutt*, 907 F.2d 1085, 1087 (11th Cir. 1990))); *Clark v. Liberty Nat. Life Ins. Co.*, 592 So. 2d 564, 565-66 (Ala. 1992) ("The courts will enforce a covenant not to compete that fits within the exception of § 8-1-1(b) only if: '1. the employer has a protectable interest; 2. the restriction is reasonably related to that interest; 3. the restriction is reasonable in time and place; [and] 4. the restriction imposes no undue hardship [on the employee].'" (quoting *DeVoe v. Cheatham*, 413 So. 2d 1141, 1142 (Ala. 1982))).

[88] Compl. ¶ 15 n.7; *id.* ¶ 18 n.11; Protective Agreement at Preamble; LLC Agreement at Preamble.

[89] Ala. Code § 8-1-190(b)(3).

21

District Court for the Middle District of Alabama observed that "[a] survey of Alabama cases strongly suggests that the five year period is at the outer most limits of what is considered reasonable by the Alabama Courts. The great weight of authority suggests that, to be reasonable, a non-competition agreement's time restraint should be shorter."[90]

With respect to geographic scope, the restrictions at issue cover "the United States or any other jurisdiction in which [HighTower or HTT Newco] does business."[91] "To secure enforcement of a non-compete clause within a particular territory, the employer must demonstrate that it continues to engage, in that locale, in the activity that it seeks to enjoin."[92] But Gibson is only registered as an investment advisor in Alabama, meaning that he cannot transact business outside of the state.[93]

---

[90] *Concrete Co. v. Lambert*, 510 F. Supp. 2d 570, 583-84 (M.D. Ala. 2007) (citing cases); *see also Mason Corp. v. Kennedy*, 244 So. 2d 585, 589-90 (Ala. 1971) (invalidating a restrictive covenant with a five-year limitations period); *Sheffield v. Stoudenmire*, 553 So. 2d 125, 126-27 (Ala. 1989) (same); *Cajun Steamer Ventures, LLC v. Thompson*, 402 F. Supp. 3d 1328, 1340 (N.D. Ala. 2019) ("[B]ecause only a restraint up to two years is presumed reasonable [under Section 8-1-190(b)(4)], and because [plaintiff] provided no allegations or facts why the five-year restraint was reasonable, the court cannot find the five-year restraint is reasonable in time.").

[91] Protective Agreement § 5; LLC Agreement § 6.7(c).

[92] *Nationwide*, 907 F.2d at 1088.

[93] *See* Gibson Registration History (reflecting registration as an investment advisor only in Alabama, not in any other states nor with any federal regulator); *see also Nobles-Hamilton v. Thompson*, 883 So. 2d 1247, 1251 (Ala. Civ. App. 2003) (noting that a covenant covering "anywhere" would be unreasonable); *Morris-Shea Bridge Co., Inc., v. Cajun Indus., LLC*,

Finally, HighTower is not reasonably likely to succeed in demonstrating that the covenants are "reasonably related" to the good will interest it purchased.[94] The covenants broadly restrict Gibson from engaging in the expansively defined "Business."[95] This restriction seems broader than necessary to protect the good will

---

2021 WL 4084516, at *5-6 (S.D. Tex. Feb. 22, 2021) (applying Alabama law to invalidate a restrictive covenant covering all of North America).

HighTower relies on the Alabama Supreme Court's decision in *Kershaw v. Knox Kershaw, Inc.* to argue that a five-year, nationwide restriction is reasonable. There, the restrictive covenant applied to "any county or province within the United States and Canada in which [the plaintiff] . . . shall do business at any time during said five (5) year period." *Kershaw*, 523 So. 2d at 359. The court held that the original covenant, which used the phrase "shall do business," was unreasonably broad and unenforceable because it prohibited new and "unidentifiable areas" of business. *Id.* But it went on to explain that the non-compete was enforceable for five years "to the extent that it prohibits [defendant] from leasing the specified equipment in any place in the United States or Canada where [plaintiff], did business prior to or on" the date the defendant separated from the plaintiff's business. *Id.*

I read *Kershaw* as undermining HighTower's position. The covenant in the Protective Agreement restricts Gibson from engaging in "any other business that HighTower conducts or operates or takes material steps toward conducting or operating *at any time during the term of the* [Partnership Services and Affiliation Agreement]." Protective Agreement § 11(a) (emphasis added); *see also* LLC Agreement Art. I (defining "Business" as "(i) so long as the Partner Agreements are in effect, the business of the Company [i.e., HTT Newco] and any Permitted Partner Assignee as contemplated by the Partnership Services and Affiliation Agreement, and (ii) *thereafter*, the business of the Company and any Permitted Partner Assignee providing wealth management, investment advisory and brokerage services or products relating and ancillary thereto" (emphasis added)). Like the invalid covenant in *Kershaw*, the covenants here contemplate restrictions in presently "unidentifiable areas" of business, "subject[ing Gibson] to the future decisions of [HighTower]." *Kershaw*, 523 So. 2d at 359.

[94] *See Picker*, 935 F.2d at 260; *Clark*, 592 So. 2d at 565.

[95] LLC Agreement § 6.7(c) (prohibiting Gibson from "becom[ing] engaged or involved in any Person engaged in or to engage in the Business within . . . [the Territory]"); Protective Agreement § 5 (same). *See supra* notes 9 & 14 for the definitions of "Business" in the LLC Agreement and the Protective Agreement.

23

HighTower purchased.  For example, the covenants would prohibit Gibson from developing new client relationships unrelated to those sold to HighTower.[96]

## C.    Alabama's Interests Outweigh Delaware's Interests.

As discussed above, Alabama has a strong policy opposing the enforcement of non-competes.  Against this is Delaware's interest in freedom of contract and in "upholding a *lingua franca* for sophisticated commercial parties."[97]

"The entire purpose of the Restatement analysis is to prevent parties from contracting around the law of the default state by importing the law of a more contractarian state, unless that second state also has a compelling interest in enforcement."[98]    Here, Alabama's interest in preventing the enforcement of

---

[96] *Cf. James S. Kemper & Co. Se. v. Cox & Assocs., Inc.*, 434 So. 2d 1380, 1383-85 (Ala. 1983).  In *James S. Kemper & Co.*, plaintiff James S. Kemper & Co. was an insurance brokerage business engaged in property and casualty insurance.  While employed by Kemper, the defendant had operated in the lumber industry casualty insurance field.  The Alabama Supreme Court upheld a restrictive covenant prohibiting the former employee from "[i]n any way disturb[ing], or seek[ing] to secure discontinuance of, any insurance business (of which the [former employee] has secured any knowledge due to [his] employment by the Company [Kemper], or produced by [him] during the [his] employment) carried by the company, or its successor or assignee." *Id.* at 1383.  The court reasoned that the "restrictions in the covenant reasonably relate[d] to the protection of Kemper's interest in a narrow, identifiable group of clients and potential clients, where Kemper ha[d] a work product investment in those clients with which [the former employee] was involved." *Id.* at 1384.  The restriction was "limited to two identifiable groups; the covenant d[id] not restrict [the former employee] from dealing with non-lumber customers or even with lumber customers that [we]re not currently customers or quoted prospects of [the Company]." *Id.* at 1385 (emphasis added).  The covenants here are not so limited to "narrow, identifiable group[s] of clients and potential clients."

[97] *FP UC*, 2020 WL 1492783, at *11.

[98] *Ascension*, 2015 WL 356002, at *5; *see also FP UC*, 2020 WL 1492783, at *11.

non-competes against an Alabama resident working in Alabama is more significant than Delaware's general contractarian policies. "Alabama's legislature specifically addressed the enforceability of non-competes when applied to professionals, and it acted to protect its citizens' ability to access professional services."[99] Alabama also codified a policy against overbroad non-competes.[100]

The Alabama Code states that Section 8-1-190 "expresses fundamental public policies of the State of Alabama."[101] It further provides that the Alabama Code shall "govern and shall be applied instead of any foreign laws that might otherwise be applicable in those instances when the application of those foreign laws would violate [Alabama's] fundamental public polic[ies]."[102] To apply Delaware law in these circumstances would undermine these legislatively expressed interests.

*         *         *

HighTower has not demonstrated a reasonable likelihood of success on the merits of its claims for enforcement of the non-competes in the Protective Agreement and the LLC Agreement. The provisions are likely unenforceable under

---

[99] *FP UC*, 2020 WL 1492783, at \*11; *see supra* note 68 and accompanying text (describing the statutory basis for the professional exemption).

[100] *See supra* note 87 and accompanying text (describing the statutory basis for the reasonableness requirement).

[101] Ala. Code § 8-1-197.

[102] *Id.*

Alabama law.  I therefore need not consider whether HighTower has shown a risk of irreparable harm and a favorable balance of the equities.[103]

## III.   CONCLUSION

HighTower's motion for a preliminary injunction is denied.  An appropriate order will be entered by the court.  The parties are to confer on what, if any, further proceedings are appropriate in this matter and file a joint status update within 30 days of this decision.

---

[103] I note that the balance of the equities appears to favor Gibson.  An injunction would harm not only Gibson but also his clients and investors.  Those clients' funds could be put at risk if Gibson suddenly ceased operating BrightHaven. *See Cantor Fitzgerald*, 724 A.2d at 587 (explaining that the court may "consider the impact an injunction will have on the public and on innocent third parties").